**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

MAY 11 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* ELIO MONTENEGRO;<br>PEOPLE OF THE STATE OF ILLINOIS,<br>*ex rel.* ELIO MONTENEGRO,<br>         Plaintiff,<br><br>         v.<br><br>ROSELAND COMMUNITY HOSPITAL<br>ASSOCIATION; AMERICAN MEDICAL LAB;<br>TERRILL APPLEWHITE; and FIVE APPLES<br>INPATIENT SPECIALISTS LLC;<br><br><br><br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1:21-cv-02544
Judge Rebecca R. Pallmeyer
Magistrate Judge Sheila M. Finnegan

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2) and
740 ILCS 92/15(b)**

JURY TRIAL DEMANDED

## <u>COMPLAINT</u>

Plaintiff-Relator Elio Montenegro ("Montenegro" or the "Relator"), through his attorneys

and on behalf of the United States of America and the State of Illinois, brings this action against

Roseland Community Hospital Association, American Medical Lab Ltd., Terrill Applewhite and

Five Apples/Inpatient Specialists LLC alleging as follows:

**I.      <u>NATURE OF THE CASE</u>**

1.      This action seeks to recover damages and civil penalties on behalf of the United

States of America and the State of Illinois arising from false statements and claims made or caused

to be made by the Defendants to: (1) the United States and its agents and intermediaries in violation

of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA"); (2) the State of Illinois

and its agents in violation of the Illinois False Claims Act, 740 ILCS 175/1 *et seq* (the "IFCA");

and (3) Illinois insurance companies, insured persons and their agents, and intermediaries in

violation of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.* (the "ICFPA").

2.     During the COVID-19 Pandemic, the Defendants provided testing for patients to determine whether they were positive for the COVID-19 virus. However, as detailed below, rather than rally to the public health, the defendants took advantage of the global and national health emergency to profiteer, prescribing and billing for medically unnecessary tests and even for services that were never actually provided. Defendants did this at the expense of taxpayers and private insurance companies, aware that Congress had passed legislation requiring absolute payment for COVID-19 related treatment, including testing. Defendants' conduct is particularly egregious because it took place at a "Safety Net Hospital" that serves economically disadvantaged people, many of which are also members of the minority community that has been hit especially hard by the COVID pandemic. While these disadvantaged patients suffered, the Defendants billed and were paid millions of dollars for services that were medically unnecessary or were never provided at all.

3.     This misconduct began in early March 2020, when the COVID-19 public health crisis first struck the United States and there was a national priority on testing to identify persons with active COVID-19 infections. At that time, Roseland formulated a plan to provide drive thru testing for the virus. Two very different types of testing were then available: diagnostic tests and serology tests. The diagnostic tests include molecular tests, or PCR, tests. These tests are usually performed via a nasal swab and are used by health professionals to detect and determine active infection with the virus that causes COVID-19. On the other hand, the serology test is a blood test used to detect the presence of antibodies, which can indicate whether the patient previously had COVID-19. Serology tests are not used to detect the active presence of the COVID-19 infection.

2

4.      Rather than make an individual medical determination as to the type of testing that was medically appropriate for each patient, and without sharing information about the different purposes for the tests, Roseland encouraged patients who wanted to be tested for active COVID-19 infection to receive both PCR and serology tests. Roseland used different tactics to do this, including by telling patients that the results of the serology test would be provided much more quickly than the PCR test *without* also telling them that the test was medically unnecessary and could not detect an active COVID-19 infection.

5.      Apparently not content to just make additional money by conducting and submitting claims for the unnecessary serology tests, several months into the Pandemic, Roseland and AML determined that they could make even more money by performing and billing for full blood panels as part of the serology test, even though the patient's inquiry was limited to COVID-19 screening.  As a result, Roseland and AML were able to increase the amount they billed and were reimbursed for a single serology test from approximately $150 to $800 for what would be tens of thousands of tests.

6.      Moreover, Roseland employed Dr. Terrill Applewhite, an independent contractor, as Medical Director overseeing the hospital's COVID-19 response. Applewhite and his company, Five Apples Inpatient Specialists LLC ("Five Apples") billed for services related to COVID-19 testing that were never provided. Specifically, Applewhite billed his time, certifying that he had conducted patient visits relating to and stemming from patients' COVID-19 testing even though Applewhite provided no such services. Rather, it was AML that analyzed test samples and provided test results directly to patients.  Applewhite billed $144 each for tens of thousands of such fictional "visits".

7.     The Relator is an employee of Roseland where he works as the Senior Director of Development. He was involved with Roseland's COVID-19 initiative but only became aware of the unnecessary testing and false billing when he received Explanations of Benefits ("EOB") from his insurance carrier for several COVID-19 tests performed on his own children.

8.     When he asked about the additional tests being run on his child's blood sample, the Relator was told frankly that Roseland and AML decided to run additional tests on the blood work to increase the Roseland's and AML's profits.

9.     The Relator also told Roseland about Applewhite's false billing practices. Recognizing the fraud perpetuated by Applewhite, Roseland terminated its relationship with the doctor on or about January 21, 2021 but did not report the prior false billings for tens of thousands of tests to anyone outside the hospital, thus concealing Applewhite's conduct.

10.    The FCA provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

11.    The FCA permits any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

12.    Similarly, the IFCA provides that any person who knowingly presents or causes to be presented a false claim to the State of Illinois (the "State" or "Illinois") for payment or approval is liable for a civil penalty for each such claim presented or paid, plus three times the amount of

4

the damages sustained by the government and other relief. The IFCA also permits any person having information regarding a false claim to bring an action as a Relator or *qui tam* plaintiff.

13.     The ICFPA, 740 ILCS 92/1-45, provides that any person who knowingly obtains, attempts to obtain or causes to be obtained, by deception, the property of an insurance company by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company is liable for a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than three times the amount of each claim for compensation.

14.     ICFPA's *qui tam* provision, 740 ILCS 92/15, provides that any interested person may bring a civil action, in the name of the State of Illinois, for violations of ILCS 92/1-45, and by incorporation, 720 ILCS 5/46-1.

15.     Roseland and AML knowingly and intentionally submitted false claims for payment, from at least 2020 to today, in violation of the FCA, IFCA and ICFPA, by fraudulently billing for medically unnecessary testing.

16.     Applewhite and Five Apples also knowingly and intentionally submitted false claims for payment, from at least 2020 to today, in violation of the FCA, IFCA and ICFPA, by billing for services that were not performed.

17.     Based on these Acts, the Relator seeks to recover on behalf of the United States and the State of Illinois against the Defendants all available damages, civil penalties, and other relief.

## II.    **THE PARTIES**

18.     Relator Elio Montenegro is a citizen and resident of the State of Illinois. Montenegro has worked in the healthcare field for about 25 years. He is currently employed by

Roseland Community Hospital as a Senior Director of Development. He also serves as Roseland's coordinator for COVID-19 testing.

19.    Roseland Community Hospital Association ("Roseland") is an Illinois not-for-profit corporation with its principal place of business located at 45 W. 111th Street in Chicago, Illinois. Roseland is a "Safety Net Hospital" that provides medical services to economically disadvantaged patients regardless of their insurance status. The community of Roseland is 96% African American and over 80% of Roseland's patients are Medicaid patients, while others are on Medicare or have private insurance.

20.    American Medical Lab, Ltd. ("AML") is an assumed name for Millennium Medical Group, Inc., an Illinois corporation, and its principal place of business is located at 45 W. 111th Street, Chicago, Illinois.  AML runs the testing laboratory located in Roseland.

21.    Dr. Terrill Applewhite, MD ("Applewhite") served as Roseland's Medical Director for its COVID-19 response. He is medical doctor, and a citizen of Illinois. On information and belief, he lives at 3039 Woodhaven Drive, Bourbonnais, Illinois, 60914.

22.    Five Apples Inpatient Specialists, LLC ("Five Apples") is a limited liability company through which Applewhite runs his practice. Applewhite is the Medical Director and President/Chief Executive Officer of Five Apples. Its principal place of business is located at 400 N. Wall Street, Suite 308, Kankakee, Illinois.

### III.    JURISDICTION AND VENUE

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. This Court has supplemental jurisdiction over the state claim pursuant to 28 U.S.C. § 1367.

6

24.    There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. §3730(e).

25.    This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because all the defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in the Northern District of Illinois.

26.    Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. § 3732(a). At all times relevant to this Complaint, defendants regularly conducted substantial business within this district and maintained employees and/or offices in this district. In addition, the statutory violations, as alleged herein, occurred in this District.

27.    This action is not based on a public disclosure. Nevertheless, to the extent that there has been a public disclosure unknown to Montenegro, Montenegro is an original source under 31 U.S.C. §3730(e)(4). He has direct and independent knowledge of the information on which the allegations herein are based.

IV.    **FACTUAL ALLEGATIONS**

A.    **Reimbursement for Medical Services with Medicare, Medicaid, and Private Insurance**

28.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as "Medicare," to pay for certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §1395 to 1395 ccc.

29.    Medicare is administered by the U.S. Department of Health and Human Services ("HHS") and supervised by the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays claims submitted by participating health care providers for medical services rendered to Medicare beneficiaries.

7

30.     In 1965, the federal government also enacted the Medicaid program, a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the Secretary of HHS, through CMS. 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1).

31.     The Illinois Department of Healthcare and Family Services ("HFS") administers the Medicaid program for the State of Illinois which receives more than half of the money for the program from the United States government. HFS administers the Medicaid program in accordance with the regulations of HHS and CMS to compensate healthcare professionals for services provided to Medicaid recipients.

32.     All claims for reimbursement are submitted to HFS and reimbursed in combination by both the U.S. government and the State of Illinois according to the federal medical assistance percentage established by HHS.

33.     At all times relevant to this Complaint, the United States provided funds to Illinois through the Medicaid program, pursuant to Title XIX of the Social Security Act, 42 U.S.C. §1396 *et seq.*

34.     Under the Social Security Act, medical care providers may seek payment from the United States for providing "reasonable and necessary" health care services. 42 U.S.C. 1395y(a)(1). As a condition of billing the Government, and receiving Government reimbursement or funding, Defendants are required to certify and ensure that all services provided are medically

8

necessary and are supported by documentation. 42 U.S.C. §1320c-5(a); 42 C.F.R. §466.71(d), 1004.10.

35.     Health care providers submit Medicare and Medicaid bills electronically.

36.     Numerous private insurers also reimburse health care providers for services performed on beneficiaries.

37.     In order to obtain reimbursements from insurers for services provided, medical providers typically submit an electronic form itemizing the services and charges associated with the services. Payment by private insurers for these services are conditioned upon medical care providers following federal and state law.

38.     Health care providers use Current Procedural Terminology ("CPT") codes. CPT codes are a uniform way to accurately describe medical, surgical and diagnostic services provided to patients and the codes are required when billing for services rendered to government and private insurers.

**B.      The COVID-19 Pandemic and Testing for COVID-19**

39.     In early 2020, the United States, and the world, faced an unprecedented pandemic as a result of COVID-19 (the "Pandemic").

40.     In response to the Pandemic, Congress passed The Families First Coronavirus Response Act (FFCRA) on March 18, 2020 and mandated that Medicare, Medicaid, and private insurance plans cover COVID-19 diagnostic testing and administration costs without cost-sharing.

41.     The CARES Act was enacted on March 27, 2020. Section 3201 of the CARES Act amended section 6001 of the FFCRA to include a broader range of diagnostic items and services that plans and issuers must cover without any cost-sharing requirements, prior authorization or other medical management requirements.

42.    Section 6008 of the FFCRA authorized a 6.2% increase in federal Medicaid matching funds to help states adequately respond to the COVID-19 Pandemic.

43.    Two different types of COVID-19 tests that are relevant here are used in the context of COVID-19. The first is a polymerase chain reaction (PCR) test that detects the presence of a virus if someone is infected at the time of the test. A PCR test is performed by taking a nasal or saliva swab.

44.    The second type of test is a serology (or antibody) test that looks for antibodies in blood to determine if one had a past infection with the virus that causes COVID-19.

45.    CMS determined that both PCR and serology tests qualified for reimbursement. However, the basic requirements that medical services be reasonable and medically necessary still applied to COVID-19 testing.  Thus, for a claim to be payable it must be medically necessary.

46.    It is the responsibility of the health care provider to conduct an individualized evaluation of each patient and to make a determination about what tests or services, if any, are medically appropriate in accordance with accepted standards of current medical practice. Determining medical necessity involves an assessment of the clinical condition, diagnosis, history and other clinical indications individual to each patient.

## C.    Roseland's Scheme to Defraud the Government and Private-Payors by Prescribing and Submitting Claims for Reimbursement for Medically Unnecessary Tests

47.    In February of 2020, in response to the increase in COVID-19 cases, Roseland geared up to perform COVID-19 testing.

48.    Applewhite was named as Roseland's Medical Director of its COVID-19 Initiative at the time.

49.     Roseland's COVID-19 initiative was multi-faceted and included the development of a drive-thru testing system to facilitate COVID-19 testing for the community. Negative results were provided by email and positive results were provided via a phone call by a clinician, usually a nurse.

50.     Initially, Roseland sent its collected samples to Quest Diagnostics for analysis. Later, AML secured equipment and reagents to perform such testing onsite at Roseland Community Hospital using its own equipment and personnel. Roseland and AML's established relationship allowed Roseland to bill for the facility and administrative piece of the COVID-19 testing, while AML billed for the processing and review of the tests results.

51.     There was a high demand to identify active COVID-19 infections and to contact and quarantine infected patients. This was the purpose of the PCR diagnostic test. However, when Roseland realized it could bill patients for both a PCR test and a serology test, regardless of need, it developed a policy that was based not on the medical needs of the individual patient, but rather on the profits to be gained trading on the public's fear of COVID-19 to encourage unnecessary serology tests.

52.     On March 31, 2020, Roseland developed a written COVID-19 testing policy whereby the determination of whether a PCR test, a serology test, or both, would be given was ostensibly left up to the patient without regard to any physician's determination of medical necessity. However, patients were left to make this decision based on one-sided information that encouraged patients to unwittingly elect unnecessary serology tests.

53.     In furtherance of this scheme, Roseland failed to advise its patients that a serology test would not test for an active COVID-19 infection, instead emphasizing that serology test results would be provided within 24 hours while PCR test results would take 3-7 days. Not surprisingly,

with this misleading information, upwards of 95% of patients opted for a serology test, often in conjunction with a PCR test – both of which were administered and billed for regardless of actual medical necessity.

54.     This policy of encouraging unnecessary serology tests regardless of the patient's clinical condition continues at Roseland to this day.

55.     Defendants knew that in order to bill Medicare and Medicaid for this testing, a physician's order was needed and that this required a physician to conduct an individualized assessment of each patient and develop a plan of care which included testing and services which were medically necessary. Despite this, no doctor at Roseland made any independent determination of the medical necessity of either type of COVID-19 test for Roseland's patients. Rather, Applewhite wrote a single prescription that was then was photocopied tens of thousands of times for different patients. This resulted in massive amounts of unnecessary care, overtreatment of patients, and overbilling to Medicare and private insurers, for the sole purpose of obtaining larger reimbursements and greater profits for Roseland, AML, Applewhite and Five Apples. Billing was submitted by a third-party known as "Change Healthcare."

56.     By submitting orders for both PCR and serology testing without conducting individualized assessments of each patient's clinical condition, Roseland falsely represented to payors that each test was medically necessary.

57.     In reality, the serology tests were not medically necessary or appropriate in the majority of cases. Roseland and the other defendants knew this yet continued to submit false claims for reimbursement with the intent to defraud the payors.

58.     In addition to conducting both PCR and antibody testing Roseland decided it could use the drawn blood from the antibody testing to further defraud the government. Specifically,

approximately three months into the Pandemic, Roseland decided to use the blood drawn for COVID-19 tests to test for additional, and unnecessary, conditions such as chlamydia pneumoniae (a bacterial infection), Mycoplasma pneumoniae (a bacterial infection), Bordetella (a bacterial infection) and other viruses. In other words, while patients came to the hospital for a COVID-19 test, Roseland ran and billed for a "full panel" of blood tests. These additional and unnecessary tests run automatically on all patients that received a COVID-19 serology test were not based on any determination as to whether such tests were medically necessary; the tests were conducted regardless of the patient's clinical condition, history or even desires; and the sole purpose of this additional testing was the enrichment of Roseland and the other defendants at the expense of third-party payors including Medicare, Medicaid and private insurance companies.

59.     For example, Roseland would bill approximately $600 for a COVID-19 PCR and serology test but for the full panels of blood tests that Roseland determined to bill, this increased to upwards of thousands of dollars. On average, Roseland and AML could recoup up to an additional $600-$700 for each these full blood panels, in addition to the $150 they were receiving for the COVID-19 serology test. This was repeated in tens of thousands of cases.

60.     Roseland and AML sent bills or claims for these medically unnecessary tests to Medicare, Medicaid, and to private insurers, including but not limited to Blue Cross Blue Shield, AMITA Health and UnitedHealthcare, falsely representing that these tests were medically necessary.

61.     Relator realized that additional and unnecessary tests were being performed on patients' blood when he received an EOB for his own child who had a PCR and serology test performed. The EOB displayed $2,986 in submitted charges for what he thought was only COVID-

19 testing but which in fact was both a PCR test and a full blood panel test for unrelated conditions not indicated whatsoever.

62.     Relator expressed his concerns about this billing to both the CEO of Roseland, Tim Egan, and the CFO of Roseland, Robert Vais. When he asked why tests unrelated to COVID-19 were being performed, both Egan and Vais indicated that it was so Roseland could earn more profits.  Both Egan and Vais also told Relator that AML, through its President Walid Dabaj, told them it was proper to run and bill for these additional tests.

63.     Roseland and AML incurred the same costs to run just the COVID-19 test as it incurred when it ran additional and unnecessary tests, so the increased billing for unnecessary full blood panels amounted to pure profit for them at the expense of the third-party payors, including the United States government, the State of Illinois and private insurance companies.

64.     Roseland began receiving complaints from insured patients as they were receiving EOBs and/or bills that showed amounts owed for this additional testing. Concerned about patients complaining to the government or their insurers about the unnecessary testing, Roseland and AML sent letters on "Change Healthcare" letterhead to these patients, indicating that the bill was in error and that no money was due for their co-payment. However, the claims to the Government payors and private insurers were not withdrawn. This was because Roseland and AML, potentially with the involvement of Change Healthcare, were looking to bilk only the Government and private insurers.

### D.     Applewhite and Five Apples' Scheme to Defraud the Government and Private-Payors For Services Related to COVID-19 Testing They Did Not Provide

65.     In addition to prescribing patients medically unnecessary blood work, Applewhite was submitting false claims for services related to COVID-19 testing through his practice, Five Apples. This included patients served at Roseland.

14

66.    In order to obtain reimbursement from insurers for services provided, Applewhite and AML were required to submit documentation to the payors describing the services performed and including a CPT code that indicated the type and level of services performed by the provider. By submitting claims for payment or reimbursement physicians represent to government payors and private insurance companies that the medical services for which the particular CPT code represents, were in fact performed.

67.    Routinely during the relevant period, Applewhite knowingly created and presented for reimbursement false and fraudulent claims for payment for medical services that neither he nor Five Apples provided. In total, this included tens of thousands of claims for reimbursement of $144 per patient under CPT Code 99203.

68.    These claims were false because CPT Code 99203 requires that there be an office or other outpatient visit for the evaluation and management of a new patient. Such visits require three key components: taking of a detailed patient history; conducting a detailed examination of the patient; and making a medical decision based on the information the physician thus learns. For services provided using this code, physicians typically spend 30 minutes face-to-face with the patient and/or family.

69.    In Applewhite's case, however, he did not conduct patient visits, consult with the patients, review their COVID-19 results or communicate those results to them. Nevertheless, Applewhite and Five Apples continually submitted false claims for reimbursement for patient visits resulting from the COVID-19 testing.

70.    Beginning in 2020 and continuing through his termination from Roseland, Applewhite and Five Apples, in furtherance of their scheme to defraud, submitted to Medicare/Medicaid and third-party payors bills and claims for reimbursement for services not

provided, all with the intent of deceiving government payors and private insurers into paying false claims related to tens of thousands of patient visits purportedly conducted by Applewhite but which did not occur.

71.     Relator realized that Five Apples was billing for Applewhite's time when another member of his family was tested for COVID-19 at Roseland, and the EOB showed a claim by Five Apples under CPT Code 99203.  However, Relator knew that Applewhite had not seen his family member or been involved in his testing process. Additionally, due to Relator's position at Roseland and his conversations with high level administrative personnel, he also knew that all the processing and reviewing of testing was done by AML.

72.     On or about September 20, 2020, Relator informed Egan that Applewhite was falsely billing for patient visits, when in fact he had no contact with the patients. In response, Roseland ultimately terminated its professional relationship with Applewhite. However, Roseland never disclosed these false billings to any government agency or private insurer and continues to conceal the conduct.

73.     On information and belief, Applewhite billed for approximately 20,000 to 25,000 patient visits, receiving $144 for each, resulting in between $2.88 and $3.6 million in fraudulent billing to government and private insurers.

74.     The matters alleged herein have not been "publicly disclosed" within the meaning of the FCA.

### E.     Procedural Compliance

75.     Pursuant to 31 U.S.C. § 3730(b)(2), this complaint is to be filed in camera and remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

76.     Pursuant to 31 U.S.C.§ 3730(b) and (c), the Government, acting by and through the Department of Justice, may elect to intervene and proceed with this action, within a period of 60 days, after it has received both the Complaint and a Statement of Material Evidence and information relating to the instant action.

77.     Pursuant to 31 U.S.C.§ 3730(b)(2), the Relator will provide to the Department of Justice, following the filing of the instant Complaint, a statement of material evidence and information. The statement of material evidence and information will support the Relator's assertions and contentions regarding the submission of false and fraudulent claims by the defendants.

78.     Pursuant to 740 ILCS 175/4(b)(2), this complaint is to be filed in camera and remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

79.     Further, pursuant to 740 ILCS 175/4(b), the State, acting by and through the Attorney General of the State of Illinois, may elect to intervene and proceed with this action, within a period of 60 days, after it has received both the Complaint and a Statement of Material Evidence and information relating to the instant action.

80.     Pursuant to 740 ILCS 175 4(b), the Relator will provide to the Attorney General, following the filing of the instant Complaint, a statement of material evidence and information, which will support the Relator's assertions and contentions regarding the submission of false and fraudulent claims by the defendants.

81.     Pursuant to 740 ILCS 92/15(b) this complaint is to be filed in camera and remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

82.    Pursuant to 740 ILCS 92/15(b) and (c), the State of Illinois, acting by and through the Attorney General, may elect to intervene and proceed with this action, within a period of 60 days, after it has received both the Complaint and a Statement of Material Evidence and information relating to the instant action.

83.    Pursuant to 740 ILCS 92/15(b), the Relator will provide to the Attorney General, following the filing of the instant Complaint, a statement of material evidence and information. The statement of material evidence and information will support the Relator's assertions and contentions regarding the submission of false and fraudulent claims by Montenegro.

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a) (Roseland, AML, Applewhite and Five Apples)**

84.    Relator incorporates by reference and re-alleges Paragraphs 1-83 as if fully set forth herein. This Count is brought by Relator in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for defendants' violations of 31 U.S.C. §3729.

85.    Acting as aforementioned, Defendants knowingly or acting with deliberate ignorance, or with reckless disregard for the truth, caused false and/or fraudulent payments to be presented to the United States government.

86.    By virtue of the above-described acts, among others, defendants Roseland and AML knowingly caused to be presented, and possibly continue to cause to be presented, directly or indirectly to officers, employees, or agents of the United States, false or fraudulent claims for payment or approval for defendants' medically unnecessary testing.

87.    By virtue of the above-described acts, among others, defendants Applewhite and Five Apples knowingly caused to be presented, and possibly continue to cause to be presented,

directly or indirectly to officers, employees, or agents of the United States, false or fraudulent claims for payment or approval for medical services that these defendants did not perform.

88.    By virtue of the above-described acts, among others, defendants Roseland and AML knowingly made, used, or caused to be made or used, and may continue to make, use, or cause to be made or used, false records and statements to obtain payment from the United States for false or fraudulent claims for medically unnecessary testing.

89.    By virtue of the above-described acts, among others, defendants Applewhite and Five Apples knowingly made, used, or caused to be made or used, false records and statements to obtain payment from the United States for false or fraudulent claims for medical services that these defendants did not perform.

90.    By virtue of the above-described acts, all the defendants conspired to defraud the United States by presenting or causing to be presented false or fraudulent claims for payment.

91.    The false or fraudulent claims to the United States were material.

92.    Plaintiff United States, being unaware of the falsity of the claims and/or statements made or caused by the defendants, and in reliance on the accuracy thereof, paid and may continue to pay for defendants' unnecessary medical testing and services for which it billed, but did not perform.

93.    The United States sustained damages as a direct and proximate result of the defendants' actions.

### COUNT II
### Illinois False Claims Act
### 740 IL740 ILCS § 175/3 (Roseland, AML, Applewhite, and Five Apples)

94.    The Relator re-alleges and incorporates herein by reference paragraphs 1-93 above, as if fully set forth herein.

19

95.     By virtue of the above-described acts, among others, defendants Roseland and AML knowingly caused to be presented, and possibly continue to cause to be presented, directly or indirectly to officers, employees, or agents of the State of Illinois, false or fraudulent claims for payment or approval for defendants' medically unnecessary testing.

96.     Acting as aforementioned, defendants Applewhite and Five Apples knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, made, used, or caused to be made or used, and may continue to make, use, or cause to be made or used, false records and statements to obtain payment from the State of Illinois for false or fraudulent claims for medically unnecessary testing.

97.     By virtue of the above-described acts, among others, defendants Roseland and AML knowingly made, used, or caused to be made or used, and may continue to make, use, or cause to be made or used, false records and statements to obtain payment from the State of Illinois for false or fraudulent claims for medically unnecessary testing.

98.     By virtue of the above-described acts, among others, defendants Applewhite and Five Apples knowingly made, used, or caused to be made or used, false records and statements to obtain payment from the State of Illinois for false or fraudulent claims for medical services that these defendants did not perform.

99.     By virtue of the above-described acts, all the defendants conspired to defraud the State of Illinois by presenting or causing to be presented false or fraudulent claims for payment.

100.    The false or fraudulent claims to the State of Illinois were material.

101.    Plaintiff State of Illinois, being unaware of the falsity of the claims and/or statements made or caused by the defendants, and in reliance on the accuracy thereof, paid and

may continue to pay for defendants' unnecessary medical testing and services for which it billed, but did not perform.

102.     The State of Illinois sustained damages as a direct and proximate result of the defendants' actions.

## COUNT III
### Illinois Insurance Claims Fraud Prevention Act
### 740 ILCS 92/1 *et seq.* (Roseland, AML, Applewhite, and Five Apples)

103.     Relator incorporates by reference and re-allege Paragraphs 1-102 as if fully set forth herein. This Count is brought by Relator in the name of the State of Illinois under the *qui tam* provisions of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/15.

104.     Relator is an interested person with direct, personal knowledge of the allegations of this complaint, who has brought this action pursuant to 740 ILCS 92/1-45 on behalf of himself and the State of Illinois.

105.     Subsection 5(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a civil action against any person who commits the crime of insurance fraud or who knowingly offers or pays "any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." 740 ILCS 92/5(a).

106.     Pursuant to 720 ILCS 5/46-1 of the Illinois Criminal Code, a person commits the offense of insurance fraud when he: "knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company."

107.    Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a *qui tam* civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Subsection 15(a) provides: "An interested person may bring a civil action for a violation of this Act for the person and the State of Illinois. The action shall be brought in the name of the State." 740 ILCS 92/15(a).

108.    By committing the acts alleged above, defendants violated 740 ILCS 92/1-45 by repeatedly, willfully, and intentionally causing to be obtained, by deception, control over the property of insurance companies by causing a false claim to be made on a policy of insurance.

109.    The actions of defendants, including billing for services not rendered and billing for unnecessary tests constitute making false claims for the purpose of obtaining by deception control over the property of the insurance companies and insurance proceeds within the meaning of 720 ILCS 5/46-1.

110.    By committing the acts alleged above, defendants Roseland and AML violated 740 ILCS 92/1-45 by repeatedly, willfully and intentionally conspiring to and causing false claims for reimbursement to insurers to be submitted for medically unnecessary testing from 2020 to today.

111.    By committing the acts alleged above, defendants Applewhite and Five Apples violated 740 ILCS 92/1-45 by repeatedly, willfully and intentionally conspiring to and causing false claims for reimbursement to insurers to be submitted for medical services that were not rendered from 2020 to on or about January 21, 2021.

112.    By failing to disclose and actively concealing that claims submitted to insurers were for medically unnecessary testing or medical services that were not rendered, the claims the defendants conspired to, and caused to be submitted to insurers contained false, incomplete, and misleading information that was material to the claim.

113.    Insurers were unaware of the falsity of the records, statements, and claims made or caused to be made by defendants at the time the insurers reimbursed defendants and for medically unnecessary tests and unperformed services.

114.    Each claim for reimbursement from an insurer that defendants conspired to, or caused, to be submitted for providing medically unnecessary testing or unperformed services represents a false claim.

115.    As a result of the defendants' certified claims for payment in its reimbursement submissions to the private insurers, at least one private insurer made payments to the defendants for medically unnecessary testing and for services that were not performed.

116.    Relator cannot at this time identify all of the false claims to private insurers for payment that were caused by defendants' conduct. The false or fraudulent claims were presented by multiple separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

117.    The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by defendants in violation of 740 ILCS 92/5. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**WHEREFORE,** Relator requests that judgment be entered against Defendants, ordering that:

(a) Defendants cease and desist from violating the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, the Illinois False Claims Act, 740 ILCS 175/1, and the Illinois Insurance Claims Frauds Prevention Act, 740 ILCS 92;

(b) Defendants pay an amount equal to three times the amount of damages the United States and the States of Illinois have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 3729, not less than $5,500 and not more than $11,000 for each violation of 740 ILCS 175/3, not less than $5,000 nor more than $10,000 for each violation of 740 ILCS 92/5(b);

(c) Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), 740 ILCS 175/4, and 740 ILCS Section 92/25;

(d) Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d), 740 ILCS 175/4, and the comparable provisions of the ICFPA; and

(e) The United State, the States of Illinois, and Relator be granted all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully Submitted,

**Elio Montenegro, RELATOR**

By: _____

One of his attorneys

Ricardo Meza (Atty. No. 6202784)
Meza Law
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 802-0336
rmeza@meza.law

24

Robert M. Andalman (Atty. No. 6209454)
Rachael Blackburn (Atty. No. 6277142)
Diana Guler (Atty. No. 6326990)
A&G Law LLC
542 S. Dearborn St.; 10th Floor
Chicago, IL 60605
(312) 341-3900
randalman@aandglaw.com
rblackburn@aandglaw.com
dguler@aandglaw.com