## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA, *ex rel.* ELIO MONTENEGRO; PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* ELIO MONTENEGRO
            Plaintiffs,

    v.

ROSELAND COMMUNITY HOSPITAL ASSOCIATION; AMERICAN MEDICAL LAB; TERRIL APPLEWHITE; and FIVE APPLIES INPATIENT SPECIALISTS
            Defendants

No. 21 CV 2544

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiff-Relator Elio Montenegro brings this *qui tam* action on behalf of the United States and the state of Illinois against certain medical care providers, alleging that they submitted false claims for reimbursement to private insurance companies and government payors in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)–(C) ("FAC"), the Illinois False Claims Act, 740 ILCS 175/1 *et seq.* ("IFCA"), and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.* ("IICFPA"). Defendants each move to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b). R. 48, 50, 52, 53. For the reasons that follow, the Court denies the Defendants' motions.

## BACKGROUND[1]

During the spring of 2020, at the height of the COVID-19 pandemic, it became a nation-wide priority to identify persons with active coronavirus infections. R. 1 ¶ 3. Congress enacted the Families First Coronavirus Response Act and the CARES Act to respond to the unprecedented public health crisis. *Id.* ¶¶ 40–41. These statutes mandated (among other things) that Medicare, Medicaid, and private insurance plans cover COVID-19 testing and administration costs. *See id.* Under regulations promulgated by Centers for Medicare and Medicaid Services, in order for a claim to qualify for reimbursement, health care providers were required to certify and ensure that all services provided were medically necessary and supported by documentation. 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 466.71(d), 1004.10. For example, care providers must submit CMS Form 1500 along with requests for reimbursement from Medicare, which certifies that the services for which reimbursement is requested are medically necessary. *See* R. 58-1 (Exhibit A) at 3.[2] Reimbursement for COVID-19 testing remained subject to these requirements. R. 1 ¶ 45.

Defendant Roseland Community Hospital ("Roseland"), a hospital located on the south side of Chicago, was one of the many health care providers tasked with responding to the COVID-19 testing crisis. *Id.* ¶ 19. Roseland is a "Safety Net

---

[1] For purposes of this motion, the Court accepts as true Plaintiff's factual allegations and draws all reasonable inferences in his favor. White v. United Airlines, Inc., 987 F.3d 616, 620 (7th Cir. 2021).

[2] Though Montenegro does not specifically reference this form in his complaint, the Court may take judicial notice of it. *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003); *see also United States v. Mid-Am. Psych. & Counseling Servs.*, PC, No. 2:18-CV-113-TLS, 2022 WL 3645437, at *5 (N.D. Ind. Aug. 24, 2022) (taking judicial notice of the contents of CMS Form 1500 for the purpose of addressing defendant's motion to dismiss FCA claim).

Hospital" that caters to underserved communities. *Id.* ¶¶ 2, 19. Approximately 96% of Roseland's patients are African American and over 80% are Medicaid recipients. *Id.* ¶ 19.

Defendant American Medical Lab, Ltd. ("AML") administers Roseland's testing laboratory. *Id.* ¶ 20. In February 2020, Roseland and AML prepared for on-site COVID-19 testing and hired Defendant Terril Applewhite as Medical Director to help run their testing initiative. *Id.* ¶¶ 6, 47. Roseland offered two kinds of COVID-19 tests to patients: a polymerase chain reaction or "PCR" test done by nasal swab and a serology test done by blood sample. *Id.* ¶¶ 43, 53. Unlike a PCR test, a serology test detects antibodies but does not detect the presence of an active COVID-19 infection. *Id.* ¶ 3.

At the time that the complaint was filed, Plaintiff-Relator Elio Montenegro was Roseland's Senior Director of Development and coordinator for COVID-19 testing.[3] *Id.* ¶ 7. He alleges that the Defendants took advantage of patients' confusion surrounding COVID-19 testing to order medically unnecessary tests and submit false claims for reimbursement. *See generally id.*

Specifically, Montenegro alleges that Roseland purposefully withheld information from patients concerning the efficacy of serology testing and encouraged those who wanted to be tested for active COVID-19 infections to receive both PCR and serology tests, even though the serology tests would not indicate whether they

---

[3] Montenegro was eventually terminated by Roseland. His termination is the subject of another lawsuit pending in this District. *See Montenegro v. Roseland Cmty. Hosp. Ass'n*, Case No. 1:23-cv-02888 (N.D. Ill. 2023).

were currently infected. *Id.* ¶¶ 52–57. Roseland and AML would then use the blood sample obtained from the serology test to run a full panel of tests for unrelated conditions, including bacterial infections that had no relationship with COVID-19, such as chlamydia pneumoniae, mycoplasma pneumoniae, and bortedella. *Id.* ¶ 58. Finally, Roseland used a third party known as "Change Healthcare" to bill Medicare and private insurers for all of the costs incurred for the testing, even though the initial patient inquiries were limited to active COVID-19 screening and there had been no determination that the unrelated tests were medically necessary. *Id.* ¶ 60. If Roseland and AML had only billed for the testing patients had requested, then the average reimbursement amount would have been about $150. *Id.* ¶ 59. But Roseland and AML's billing practices allowed them to recover reimbursements for individual patients in amounts upwards of thousands of dollars. *Id.* Montenegro estimates that the Defendants' practices resulted in as much as $3.6 million of fraudulent billing. *Id.* ¶ 73

Roseland began to receive complaints from insured patients who had gotten bills from their insurers reflecting the unnecessary testing. *Id.* ¶ 64. Roseland and AML sent these patients letters indicating that the bill was in error and no money was due for a copayment. *Id.* However, Roseland and AML did not withdraw their claims from government payors or private insurers. *Id.*

Applewhite and his company, Five Apples Inpatient Specialists ("Five Apples"), played a critical role in the alleged scheme. To certify that the serology tests and blood panels were medically necessary, Montenegro alleges that Applewhite

wrote a single prescription that was photocopied tens of thousands of times for different patients without any individualized assessment of their medical condition. *Id.* ¶ 55. Montenegro alleges that this was done for the sole purpose of obtaining larger reimbursements and greater profits for Roseland and AML. *See id.*

In addition to facilitating Roseland and AML's reimbursement scheme, Applewhite submitted false claims of his own. *Id.* ¶ 65. Health care providers must use Current Procedural Terminology, or "CPT," billing codes to describe medical, surgical, and diagnostic services when seeking reimbursement from private insurers and government payors. *Id.* ¶ 66. CPT Code 99203 requires that there be an office or other outpatient visit for the evaluation and management of a new patient. *Id.* ¶ 68. A visit requires an assessment of a patient's medical history, an examination, and a medical decision—a process that typically takes around 30 minutes. *Id.* Montenegro alleges that Applewhite did not conduct patient evaluations, consult with patients, or review their COVID-19 results. *Id.* ¶ 69. Nonetheless, Applewhite used CPT Code 99203 to bill for thousands of visits that he never performed. *Id.* ¶ 6.

Montenegro became aware of the schemes when reviewing Explanation of Benefits ("EOB") forms provided by insurance carriers for family members who had received COVID-19 testing at Roseland. *Id.* ¶¶ 7, 61, 71. An EOB for his child who had a PCR and serology test performed displayed nearly $3,000 in submitted charges for what Montenegro believed was routine COVID-19 testing. *Id.* ¶ 61. Upon further inspection, Montenegro noticed that the EOB listed costs for full blood panel testing for unrelated conditions, even though this testing was not requested. *Id.* Similarly,

Montenegro became aware that Applewhite was falsely certifying CPT forms when he reviewed a family member's EOB stating that he had been visited by Applewhite, even though he had not. *Id.* ¶ 71.

Montenegro eventually confronted Roseland's CEO, Tim Egan, and CFO, Robert Vais, about the fact that Roseland was billing for unnecessary testing. *Id.* ¶ 62. According to Montenegro, Egan and Vais acknowledged the practice and indicated that it was being done so that Roseland could increase profits. *Id.* They also told Montenegro that AML's President, Walid Dabaj, had told them that it was proper to run and bill for the additional tests. *Id.* Roseland continued to submit claims for reimbursement for the unnecessary testing after this conversation took place. *Id.* ¶ 54. Montenegro also notified Egan that Applewhite was falsely billing for visiting patients with whom he had no contact. *Id.* ¶ 72. Roseland terminated its professional relationship with Applewhite in January 2021. *Id.* However, Montenegro alleges that Roseland never disclosed Applewhite's false billings to any government agency or private insurer. *Id.*

Montenegro now brings this *qui tam* action asserting claims under the FCA the IFCA, and the IICFPA based on the Defendants' submission of false claims to government payors and private insurers. R. 1.[4] Roseland, Applewhite, and Five

---

[4] Jurisdiction over Plaintiff's claims is proper under 21 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732. Plaintiff alleges, and Defendants do not contest, that he has complied with the procedural requirements for bringing a false claims act suit by, *inter alia* filing the complaint under seal and providing the state and U.S. governments with an opportunity to intervene. R. 1 ¶¶ 75–83.

Apples move to dismiss under Rule 12(b)(6) and Rule 9(b). R. 49, 50. AML joins in each of the other Defendants' motions. R. 52, 53.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not necessarily require detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Although the Court accepts the plaintiff's well-pleaded factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

FCA claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires plaintiffs to state the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b); *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (citation omitted). To comply with Rule 9(b), a plaintiff must describe the "'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Id.* (citation omitted). While plaintiffs must "use some means of injecting precision and some measure of substantiation," "the precise details that must be included in a complaint may vary on the facts of a given case." *United States ex rel. Presser v. Acacia*

*Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (cleaned up); *accord AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011).

## ANALYSIS

### I. PLAINTIFF'S FCA AND IFCA CLAIMS

Defendants do not address Montenegro's IICFPA claim; their motions are directed solely at Montenegro's claims under the FCA and the IFCA. The FCA imposes civil liability on "any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

To state a claim under the FCA, a plaintiff must plausibly allege that (1) the defendant made a statement in order to receive money, (2) the statement was false, (3) the defendant knew that the statement was false, and (4) the statement was material to the government's decision to pay the false claim. *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015). The FCA is not limited to claims that are facially false; an FCA claim may be based on false certification to the government that the party has complied with a statute, regulation, or condition of payment. *Molina*, 17 F.4th at 739. IFCA claims are governed by the same standard. *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 739 (7th Cir. 2021), *cert. denied* 143 S. Ct. 352 (2022).

Defendants raise three arguments in support of their motions to dismiss. First, they argue that the complaint fails to comply with Federal Rule of Civil Procedure 8(a) because it relies on improper group pleading. R. 49 at 8–10; R. 50-1 at 5–9.

8

Second, they argue that the complaint does not allege that the submission or certification of any false claims with the specificity required by Rule 9(b)'s heightened pleading standard. R. 49 at 9–13; R. 50-1 at 9–10. Finally, Defendants argue that even if false statements were made or certified, they were not material. R. 49 at 13. The Court addresses each of these arguments in turn.

### A.    Federal Rule of Civil Procedure 8(a)

The Court first addresses Defendants' argument that the complaint employs improper "group pleading" in violation of Federal Rule of Civil Procedure 8(a). Rule 8(a) requires only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Defendants argue that the complaint improperly relies on "group pleading" by failing to differentiate between the various Defendants. But courts in this District recognize that "group pleading" does not violate Rule 8 as long as the complaint provides sufficient detail to put defendants on notice of the claims against them. *Marposs Societa Per Azioni v. Jenoptik Auto. N. Am., LLC*, 262 F. Supp. 3d 611, 617–18 (N.D. Ill. 2017).

Here, the complaint satisfies Rule 8(a) by setting forth individualized allegations against each of the Defendants. *See United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1114 (N.D. Ill. 2018) (rejecting group pleading argument in the FCA context where relator identified individuals who participated in the scheme by name and described the role of each).

Montenegro alleges that Roseland knowingly adopted a policy of submitting claims for reimbursement to Medicare and private insurers representing that

9

serology tests and blood panels were medically necessary when, in fact, they were not. The complaint alleges that AML, who ran Roseland's testing laboratory, performed the unnecessary tests, and acted in concert with Roseland. Finally, it alleges that Applewhite wrote a deceptive, one-size-fits-all prescription to justify the blood tests and that he and Five Apples submitted claims falsely indicating that he had conducted individual patient visits. Although the complaint uses the term "Defendants," when read in context, this term plausibly refers to incidents where the Defendants acted together. "[R]eading the allegations sensibly and as a whole, there is no genuine uncertainty regarding who is responsible for what." *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013).

## B. Falsity and Application of Rule 9(b)

Having determined that Montenegro's allegations satisfy Rule 8's pleading standard, the Court next considers whether, for each of the Defendants, the complaint has adequately alleged falsity in accordance with the FCA and Rule 9(b).

The FCA does not define what makes a claim "false" or "fraudulent." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016). The meaning of these terms is therefore determined by common law. *Id.* Under common law, fraud encompasses both express falsehoods and misrepresentations by omission, such as those made in connection with a false certification. *Id.* at 188.

The complaint describes two schemes: one by Applewhite and Five Apples for billing for patient visits that were never performed, and another by Roseland and AML for billing patients for unnecessary medical treatment in reliance on Applewhite's falsified prescriptions and patient visits. The Court considers each

10

scheme and analyzes whether Plaintiff's allegations are sufficient to state a claim and satisfy Rule 9(b)'s heightened pleading standard.

### 1. Applewhite and Five Apples' Alleged False Billing Scheme

The Court begins with Plaintiffs' allegations that Applewhite and Five Apples falsely certified that they had performed patient visits and billed for visits that never took place. These allegations present "the archetypical [FCA] claim;" one where the "claim for payment is itself literally false and fraudulent." *Molina*, 17 F.4th at 740; *see also United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, No. 13 CV 4052, 2015 WL 6153937, at *5 (N.D. Ill. Oct. 19, 2015) (quoting *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011)) ("A factually false claim is straightforward, and occurs 'when the claimant misrepresents what goods or services that it provided to the Government …'"). Because Plaintiff alleges that Applewhite and Five Apples billed Medicare for services that were never performed, the complaint sufficiently alleges falsehood under the FCA with respect to this scheme.

The allegations against Applewhite and Five Apples are also sufficiently particularized to comply with Rule 9(b). Montenegro alleges that he had direct knowledge of Applewhite's fraudulent practices due to his employment at Roseland, his conversations with Roseland's CEO and CFO, and his review of his family member's EOB form, which included a billing code falsely certifying that a patient visit had taken place. *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021) (holding that plaintiff's direct knowledge that anesthesiologists regularly falsely coded their procedures for billing purposes was sufficient to satisfy Rule 9(b)). Montenegro's allegations concerning the EOB

submissions and use of false billing codes provide "specific representative examples" of the alleged fraud. *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 656 (7th Cir. 2022).

Applewhite contends that Rule 9(b) requires Montenegro to provide more specific "transaction level detail" about the fraud, including information about specific claims submitted on behalf of specific patients on specific dates. R. 50-1 at 6–9. But the Seventh Circuit has indicated that, at the pleading stage, Montenegro does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the government. *Presser*, 836 F.3d at 777; *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 870 (7th Cir. 2011) ("A relator need not have seen the claims submitted to the federal government . . . but must know enough to make fraud a likely explanation for overbilling[.]"). While it is "essential to show a false statement" it is not necessary "for a relator to produce the invoices (and accompanying representations) at the outset of the suit." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). In sum, Montenegro has plausibly alleged FCA claims against Applewhite and Five Apples due to their fraudulent billing practices.

## 2. Roseland and AML's Alleged Scheme to Bill Insurers for Medically Unnecessary Tests

Next, the Court considers whether Montenegro's allegations that Roseland and AML knowingly submitted claims for medically unnecessary serology tests and blood panels are sufficient to state a claim under the FCA and Rule 9(b). Plaintiff's claims as to Roseland and AML are not "archetypal" FCA claims in the sense that

12

Montenegro does not allege that the tests were not performed. However, as indicated above, falsity under the FCA is not limited to cases in which literally fraudulent bills are submitted to insurers. *Escobar*, 579 U.S. at 176, 188. The FCA gives rise to liability in situations where a defendant certifies—either expressly or by omission— that the claim submitted complies with regulations. *Id.*

"Under an express false certification theory, a plaintiff must allege that a defendant 'falsely and specifically certified that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds.'" *United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1085 (N.D. Ill. 2019) (citation omitted). Alternatively, a party may be liable for implied false certification where (1) the claim requesting payment makes a specific representation about the goods and services provided and (2) the defendant's failure to disclose compliance with material statutory, regulatory, or contractual requirements makes these misrepresentations "misleading half-truths." *Escobar*, 579 U.S. at 190.

Montenegro has plausibly alleged FCA claims against Roseland and AML based on false certification. "Because medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020). "Claims for unnecessary treatment are false claims." *Id.* Montenegro alleges that, as part of the claim submission process, Roseland and AML represented to payors that blood panel tests for bacterial

conditions unrelated to COVID-19 were medically necessary. Roseland and AML submitted documentation indicating that the tests had been authorized by a physician's order or prescription following an individualized assessment of each patient's medical condition and development of a plan of care. Roseland and AML also submitted certifications to Medicare, including form CMS-1500, which contains a representation that the treatment ordered is medically necessary.[5]

These representations were plausibly false—or at least "misleading half-truths"—in light of Montenegro's allegations that (1) the bacterial conditions that were the subject of the blood panel test had no relationship to COVID-19, (2) no medical evaluations took place to determine whether the blood panels were necessary, (3) Roseland and AML relied on Applewhite's falsified prescriptions and records of patient visits to order the testing, and (4) Roseland and AML failed to disclose Applewhite's practice of fraudulent billing to insurers despite receiving complaints from patients. R. 1 ¶ 55. The facts are analogous to those in *Presser*, where the Seventh Circuit concluded that using a specific billing code on a reimbursement form constituted a representation that a "full psychological assessment[] by a therapist or an evaluation by a psychiatrist" had taken place—a representation that

---

[5] "[A] plaintiff is "free to elaborate on his factual allegations" in opposing a Rule 12(b)(6) motion "so long as the new elaborations are consistent with the pleadings." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (quotation marks omitted). Here, the reference to form CMS-1500 in Montenegro's response brief is consistent with the allegation in his complaint that the allegation that, as a condition of reimbursement, care providers are required to certify and ensure that treatment is medically necessary. R. 1 ¶ 35.

14

was plausibly false in light of allegations that no assessment had been conducted. 836 F.3d at 779.

The allegations against Roseland and AML are also specific enough to satisfy Rule 9(b). As with Applewhite's scheme, Montenegro's allegations are corroborated by his personal knowledge and his review of charges on his child's EOB form. Moreover, Montenegro alleges that he had a conversation with Roseland's officers—Vais and Egan—who acknowledged the practice of billing for medically unnecessary tests, indicated to him that the tests were being ordered to maximize profits rather than in response to medical need, and told him that AML's president had sanctioned the practice. Thus, the complaint provides "firsthand facts or data to make its suspicions plausible." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 445 (7th Cir. 2011).

Roseland points to the fact that, in *Presser,* the Seventh Circuit dismissed FCA claims that were based on the plaintiff's subjective assessment that certain treatment was medically unnecessary. R. 49 at 12. *Presser* did not hold that representations of medical necessity could *never* give rise to FCA liability, however. Rather, the flaw in the plaintiff's complaint in *Presser* was that it "did not provide any reasons *why* these treatments actually were unnecessary other than [the plaintiff's] personal view." 836 F.3d at 779 (emphasis in original). Here, by contrast, Montenegro has alleged that the serology tests and blood panels were unnecessary because they were not supported by a medical evaluation, exceeded the scope of the initial requests for treatment, had no relationship to COVID-19 (in the case of the blood panel testing),

and Roseland's officers admitted that the testing was performed to make money rather than for any legitimate medical reason. In this case, the complaint adequately provides "additional context providing reason to question the appropriateness of [the defendant's] policies." *Id.* at 780.

Indeed, while the Seventh Circuit has not directly addressed the issue, most federal circuit courts that have considered the question have found that a false certification of medical necessity can plausibly give rise to FCA liability. *See Winter*, 953 F.3d at 1118 (reversing dismissal of FCA claims based on false certification of medical necessity); *accord United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018); *see also United States v. Care Alts.*, 952 F.3d 89, 100 (3d Cir. 2020) (holding, on summary judgment, that a claim may be "false" under the FCA if it fails to comply with statutory or regulatory requirements, notwithstanding a physician's judgment); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (holding that certifications of medical necessity were plausibly false, and thus precluded dismissal of FCA claim, in circumstances where the defendants were alleged to have known that the services were unnecessary). *But see United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019) (holding, on summary judgment, that "a clinical judgment of terminal illness warranting hospice benefits under Medicare cannot be deemed false, for purposes of the [FCA], when there is only a reasonable disagreement between medical experts as to the accuracy of that conclusion, with no other evidence to prove the falsity of the assessment.").

16

Roseland cites *United States ex rel. Lisitza v. Par Pharmaceutical Companies, Incorporated*, a case decided at summary judgment in which the district court held that billing for treatment that the plaintiff deemed medically unnecessary did not constitute an express or implied false certification under the FCA. 276 F. Supp. 3d 779, 797–98 (N.D. Ill. 2017). There, the district court rejected the argument that violations of Medicare's "medically necessary" regulations established falsity for the purposes of an FCA claim, commenting that "unauthorized billing" does not absent some other "specific representation," transform requests for payment into false claims. *Id.* at 798.

Despite its broad language, *Lisitza* does not support dismissal at this early stage. In that case, there was no contention that care providers had utterly failed to evaluate medical necessity or relied on falsified records of patient visits to prescribe treatment. Instead, the plaintiffs alleged that the defendants overcharged payors by prescribing and seeking reimbursement for brand-name drugs at higher doses (rather than the originally-prescribed generic drugs at lower doses). *See generally*, 276 F. Supp. 3d 779. As was the case in *Presser*, the plaintiff's allegations provided no clear standard by which to evaluate claims that the reimbursed treatment was not medically necessary. That is not the case here, for the reasons stated above. Moreover, unlike the plaintiff in *Lisitza*, Montenegro has alleged that Roseland and AML made "specific representations" by certifying that the claims were medically necessary on Medicare forms, relying on Applewhite's falsified prescriptions and fictitious patient visits, and allegedly telling patients in writing that the billing for

17

blood panel testing was in error. At the pleading stage, these specific representations are sufficient to distinguish this case from *Lisitza* and suggest that Roseland and AML submitted claims containing false statements.

Roseland also relies upon *United States ex rel. Zverev v. USA Vein Clinics of Chicago*, a case that granted partial dismissal of FCA claims on Rule 9(b) grounds. 244 F. Supp. 3d 737 (N.D. Ill. 2017). There, the complaint alleged that defendant technicians "recommended [] surgery as medically necessary in a very high percentage of the patients for which they performed ultrasounds (in some cases, almost 100%)." *Id.* at 747. The plaintiff took the position that the claims of medical necessity constituted a false representation under the FCA. The district court found that the complaint did not satisfy Rule 9(b) because the allegations provided no basis to identify any fraudulent bills. *Id.* at 747.

While the plaintiff in *Zverev* asked the court to infer fraud from a diagnosis percentage—thereby providing no means to differentiate between genuine bills and the fraudulent ones—Montenegro's allegations in this case are based on the contention that the Defendants systematically failed to conduct patient assessments before ordering medical treatment, despite contrary certifications. Defendants would not be "required to review the details of every procedure performed" in order to defend against Montenegro's claim; they would only need to determine whether patient visits and assessments actually took place as certified. *Id.* at 748.

Roseland contends that Plaintiff must allege why the certifications could not have been based on "reasonable medical judgment." R. 61 at 6–8. Because a doctor

*could* have concluded that the tests were medically necessary at the time that they were ordered, Roseland argues, the certifications cannot be false for the purposes of the FCA. This argument might have some force if the Defendants had conducted medical evaluations for each patient (as they certified they did) prior to ordering treatment. But the complaint alleges that no such evaluations took place. And the plain text of the FCA "does not distinguish between 'objective' and 'subjective' falsity or carve out an exception for clinical judgments and opinions." *Winter*, 953 F.3d at 1117.

Montenegro alleges that Roseland and AML implemented a blanket policy of ordering unnecessary tests to increase profits without conducting patient visits or evaluations, despite certifications to the contrary. It is therefore clear from the face of the complaint that the claims submitted did not involve genuine medical judgment. Indeed, in *AseraCare Inc.*—which Roseland cites in support of its argument—the Eleventh Circuit concluded that falsity under the FCA could be demonstrated by a certifying physician's failure to familiarize themselves with a patient's condition before authorizing treatment. 938 F.3d at 1297 ("Where . . . a certifying physician fails to review a patient's medical records or otherwise familiarize himself with the patient's condition . . . his ill-formed 'clinical judgment' reflects an objective falsehood."). Similarly, in this case, allegations that "no doctor at Roseland made any independent determination of [] medical necessity" and that Applewhite "wrote a single prescription that was photocopied tens of thousands of times" without

reviewing medical records or familiarizing himself with patients' condition plausibly indicates that the certifications of medical necessity were objectively false. R. ¶ 55.

Finally, Roseland argues that, because of the uncertain environment surrounding COVID-19 treatment in 2020, courts should defer to the judgment of medical providers in assessing whether claims submitted for reimbursement during this time were false under the FCA. *See* R. 61 at 7–8. While Roseland's admonition might make sense as a policy matter, it cites no case law in which a comparable principle of COVID-19-based deference has been adopted in the context of FCA claims. *See also Escobar*, 579 U.S. at 192 ("[P]olicy arguments cannot supersede [] clear statutory text."). Nor does Roseland provide any explanation for how concerns about a viral pandemic would justify blanket reimbursement for tests for unrelated bacterial conditions like chlamydia without a determination of medical necessity. To the extent that considerations surrounding the pandemic are relevant to Plaintiff's FCA claims, they are more appropriately addressed at summary judgment once the parties have had the opportunity to develop the record. In sum, Plaintiffs sufficiently allege that the Defendants submitted false claims or certified claims containing false statements in violation of the FCA and the IFCA.

### C. Materiality

Finally, the Court considers whether Plaintiff has plausibly alleged that the false statements and certifications were material for each of the schemes described in the complaint. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). The materiality standard is "rigorous" and "demanding." *Sanford-*

*Brown*, 840 F.3d at 447 (citation omitted). It looks to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* Non-dispositive factors in this inquiry include (1) whether the government has designated compliance with the requirement that is the subject of the misrepresentation as a condition of payment, (2) whether the government, with knowledge of the misrepresentation, routinely pays or refuses to pay claims of the same kind, and (3) whether the noncompliance is minor or insubstantial. *Escobar*, 579 U.S. at 194. Despite its fact-intensive nature, it is appropriate to address materiality at the motion to dismiss stage. *Id.* at 198 n.6.

The Supreme Court and the Seventh Circuit have not decided whether a plaintiff must plausibly allege materiality in cases based on factual falsity or express false certification (as opposed to implied false certification). *See United States ex rel. Nedza v. Am. Imaging Mgmt., Inc.*, No. 15 C 6937, 2020 WL 1469448, at *10 (N.D. Ill. Mar. 26, 2020) ("*Escobar* dealt only with an implied certification theory, and as far as this Court can tell, neither the Supreme Court nor the Seventh Circuit has explicitly said that *Escobar*'s materiality requirement extends to all types of FCA claims.").

To the extent that Montenegro is required to allege materiality as to Applewhite and Five Apples' false billing scheme, he has done so. Allegations that a physician billed government payors for visits that never took place are plausibly sufficient to establish materiality. *See United States ex rel. Morgan v. Champion Fitness, Inc.*, No. 1:13-CV-1593, 2018 WL 5114124, at *8 (C.D. Ill. Oct. 19, 2018) ("[T]he [c]ourt has difficulty seeing what could be more material than whether or not

services were provided."). Applewhite and Five Apples do not contend otherwise. R. 50-1, 62. The Court therefore finds that Montenegro has plausibly alleged materiality with respect to this scheme.

Plaintiff has also plausibly alleged materiality with respect to Roseland and AML's overbilling scheme. Certification of medical necessity is a condition for reimbursement under the Medicare statutes. R. 1 ¶ 34.; *see Escobar*, 579 at 194. While *Escobar* indicates that not all conditions of payment are material, medical necessity under the Medicare statutes is not a trivial or technical requirement, but an essential component of reimbursement that is referenced in multiple provisions and regulations. *See* R. 1 ¶ 34. Moreover, Defendants do not contend that the government payors routinely reimburse claims with no inpatient visit or determination of medical necessity. *Escobar*, 579 at 194.

Roseland cites out-of-circuit cases for the proposition that Montenegro must "explain why" the alleged noncompliance with medical necessity regulations is material. But the allegations in these cases were much more conclusory. *See, e.g.*, *United States ex. rel. Dresser v. Qualium Corp.*, No. 5:12-CV-01745-BLF, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) (finding that the plaintiff failed to plead materiality because she did not "explain why" the defendant's failure to apply to enroll its clinics as "independent diagnostic testing facilities" would have impacted the government's reimbursement decision).

Finally, Roseland and AML's noncompliance was plausibly substantial. *Escobar*, 579 at 194. Montenegro does not allege that Defendants submitted only one

or two incorrect claims or that the claims had an insignificant financial impact. To the contrary, Plaintiff alleges that the Defendants knowingly submitted thousands of claims for reimbursement falsely certifying that treatment was medically necessary. He alleges that Defendants' practices resulted in as much as $3.6 million of fraudulent billing. R. 1 ¶ 73. At this stage, Montenegro is entitled to the reasonable inference that the false claims or certifications were material to the government payors' decision to make reimbursements. *See Nedza*, 2020 WL 1469448, at *10.

\* \* \* \*

In conclusion, because Montenegro has plausibly alleged that each of the Defendants submitted or certified materially false claims consistent with Federal Rules of Civil Procedure 8(a) and 9(b), he has stated a claim that Defendants violated the FCA and the IFCA. The Court therefore denies Defendants' motions to dismiss.

## CONCLUSION

The Court denies (1) Defendant Roseland Community Hospital Association's motion to dismiss, R. 48; (2) Defendants Terril Applewhite and Five Apples Inpatient Specialists' motion to dismiss, R. 50; and (3) Defendant American Medical Lab's motions to dismiss, R. 52, 53. Defendants have until December 14, 2023, to answer the complaint.

Date: <u>11/27/2023</u>

_____
JEREMY C. DANIEL
United States District Judge