1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4    UNITED STATES OF AMERICA, ex rel. ELIO  )
     MONTENEGRO; PEOPLE OF THE STATE OF       )
5    ILLINOIS, ex rel. ELIO MONTENEGRO,       ) Case No. 21 C 2544
                                              )
6                    Plaintiffs,              )
                                              )
7            vs.                              )
                                              )
8    ROSELAND COMMUNITY HOSPITAL              )
     ASSOCIATION; AMERICAN MEDICAL LAB;       ) Chicago, Illinois
9    TERRILL APPLEWHITE; and FIVE APPLES      ) October 10, 2020
     INPATIENT SPECIALISTS, LLC,              ) 10:00 A.M.
10                                            )
                     Defendants.              )
11
                 TRANSCRIPT OF PROCEEDINGS - In-Person Motion
12        BEFORE THE HONORABLE YOUNG B. KIM, Magistrate Judge

13   APPEARANCES:

14   For the Plaintiffs:        A&G LAW LLC
                                542 South Dearborn Street
15                              10th Floor
                                Chicago, Illinois  60605
16                              BY:  MR. ROBERT M. ANDALMAN
                                     MS. DIANA CAROLINA GULER
17
     For Defendant Roseland:    WILSON ELSER MOSKOWITZ
18                                 EDELMAN & DICKER LLP
                                55 West Monroe Street
19                              Suite 3800
                                Chicago, Illinois  60603
20                              BY:  MR. THOMAS KEVIN DUFF

21

22                      PAMELA S. WARREN, CSR, RPR
                       Official Court Reporter - Retired
23                        23869 N. High Ridge Drive
                        Lake Zurich, Illinois   60047
24                              312.823.0001

25
     NOTE:  Please notify of correct speaker identification.

```
1   APPEARANCES:  Continued

2   For Defendant AML:      DINSMORE & SHOHL LLP
                            222 West Adams Street
3                           Suite 2400
                            Chicago, Illinois  60606
4                           BY:  MR. MATTHEW CHARLES WASSERMAN
                                 MS. MICHELLE ANNE RAKESTRAW
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings held in open court:)

2          THE CLERK:  21 C 2544, United States of America, et

3  al. versus Roseland Community Hospital Association, et al.

4          THE COURT:  Okay.  Who is here on behalf of the

5  plaintiff?

6          MR. ANDALMAN:  Robert Andalman and Diana Guler, your

7  Honor.

8          THE COURT:  For Roseland.

9          MR. DUFF:  This is Thomas Duff on behalf of Roseland,

10  your Honor.

11          THE COURT:  For AML.

12          MR. WASSERMAN:  Good morning, your Honor.  Matt

13  Wasserman and Michelle Rakestraw on behalf of AML.

14          THE COURT:  Do we have anyone here for

15  Mr. -- Dr. Applewhite?

16          MR. ANDALMAN:  We don't, your Honor.  And I don't

17  anticipate they will be here.  We (unintelligible) has reached

18  a settlement, at least in principle with Dr. Applewhite and

19  Five Apples, and the government has basically approved that

20  settlement.  We're just in the process of documenting it.

21          THE COURT:  Let me -- do me a favor, Mr. Andalman, can

22  you pull the microphone closer to you?

23          MR. ANDALMAN:  Of course.

24          THE COURT:  And then if I can have Mr. Wasserman pull

25  the microphone closer to you.  Great.

1      Same with you, Mr. Duff.  Make sure it is closer to

2  you.  I just want to make sure that the record picks you up.

3      So I would like to go ahead and start discussing the

4  motion to compel that's filed against AML.  And that's Document

5  Number 109.

6      And I like to start by asking Mr. Andalman to give me

7  an update on any changes since the filing of the motion and

8  what still needs to be addressed by the Court.

9      Mr. Andalman.

10      MR. ANDALMAN:  Thank you, your Honor.  The biggest

11  change since the filing of the motion was that AML retained

12  different counsel, in essence the day before the response to

13  the motion was due.  And Mr. Wasserman then filed his

14  appearance, asked for a little additional time.

15      And he and I have spoken a number of times.  He filed

16  a response in essence agreeing that the initial response was

17  inadequate and agreeing to provide interrogatory responses and

18  document requests that were both fulsome and in proper format.

19      Based on our conversations, my understanding is he's

20  done an email collection but is still missing some critical

21  information from his client, including the billing information

22  which is obviously quite critical in this case, still being

23  collected.  And I don't know that he has completed his review

24  of the email.

25      So we have not received any additional production yet.

1   But my understanding is that AML agrees that a full production

2   is required and is working on it.

3          THE COURT:  Mr. Wasserman, response?

4          MR. WASSERMAN:  Mr. Andalman's comments are directly

5   accurate with what we discussed, your Honor.  I recognize that

6   on behalf of AML we had indicated that we would make an effort

7   to begin a rolling production as of this week and acknowledge

8   that we have not done so.

9          We haven't done so in part because, as Mr. Andalman

10  just indicated, we have gathered a substantial amount of

11  evidence.  The initial production in this case was not in

12  conformity with the Federal Rules on e-discovery.  We are

13  working on producing emails in this regard.

14         We have also collected a significant amount of -- I

15  guess I'll call it that reporting related to the COVID claims

16  at issue.

17         But as Mr. Andalman correctly indicated, I still don't

18  have a good handle on which claims were billed and by who,

19  which is obviously important in this case and needs to be

20  produced.

21         I'm working -- we are working very diligently with our

22  client to gather that information, some of which appears to be

23  in possession of third parties.  In particular a third-party

24  billing company who seems to be cooperating, along with --

25  there appears to be some billing information that may have

1  already been produced by Roseland.  I'm being careful with my

2  words because I haven't reviewed every document produced by

3  Roseland.  But I do understand that Roseland did some of the

4  billing itself at issue in this case.  And Roseland maintains

5  its own electronic medical records system in this regard.  And

6  so Roseland would be in possession of records that would be

7  subject to production as well.

8         THE COURT:  And let me ask you, Mr. Wasserman, do you

9  know who Change Healthcare is?

10        MR. WASSERMAN:  I do not.

11        THE COURT:  Mr. Andalman, do you know?

12        MR. ANDALMAN:  I believe Change Healthcare was

13  utilized by Roseland, I know, to communicate with some of the

14  individuals who had testing done.  People received emails

15  from -- or letters from Change Healthcare.  Relator was aware

16  of that.  But I don't really know what the relationship was or

17  the involvement of Change Healthcare with Roseland or AML.

18        THE COURT:  So Change Healthcare, as far as you know,

19  Mr. Andalman, is a separate and distinct entity, separate and

20  apart from AML?

21        MR. ANDALMAN:  That -- it is certainly separate and

22  apart from AML.  I think I actually received a letter from

23  Change Healthcare on some health insurance issue for my family

24  the other day, and it would be on -- completely unrelated.  I

25  think they just are a service provider.

1          THE COURT:  So going through AML's response to

2    discovery requests, AML seems to take the position that it did

3    not submit any bills or claims on behalf of Roseland for COVID-

4    19 testing.

5          That's not accurate, Mr. Wasserman?

6          MR. WASSERMAN:  From what I have learned since I was

7    retained, the answer to your question is yes.  Or correct, your

8    Honor, that is not accurate.

9          What I am struggling, and I want to make clear for the

10   Court and for the parties, is I'd like to be able to identify

11   what was actually billed by AML directly or through Roseland or

12   through a third party.  And that's been the bulk of our work

13   over the last three weeks since we got retained.

14         MR. ANDALMAN:  Your Honor, if I could just supplement

15   that.  Our understanding from now having talked to

16   Dr. Applewhite's counsel and other lawyers for these parties is

17   that AML did its own billing for a period of time and then

18   reached some kind of an agreement with Roseland whereby

19   Roseland would submit bills.  And then I don't even know the

20   word pejoratively -- by kick backed or shared the payments with

21   AML.

22         So one of the things that I have talked about with

23   both counsel for Roseland and counsel for AML is getting

24   documentation of how that arrangement worked and what the scale

25   of it was in terms of Roseland sort of kicking back or sharing

1  billings with AML.

2      THE COURT:  In your submission, plaintiff's

3  submission, plaintiff says that he was told that Roseland and

4  AML had an agreement to submit false COVID testing claims.  Who

5  told the relator that this was happening?

6      MR. ANDALMAN:  The -- I -- we were told that by

7  Dr. Applewhite's counsel that he was present for a meeting at

8  which that was discussed between the CEO of Roseland and the

9  head of AML.

10      THE COURT:  Okay.  Who is -- what's the name of the

11  CEO?

12      MR. ANDALMAN:  Ken Egan.

13      THE COURT:  And who was there for AML?

14      MR. ANDALMAN:  Walid.  I don't know his last name.

15      MR. WASSERMAN:  His last name is spelled D-A-J-A-B, I

16  believe.  I could double check to confirm.

17      THE COURT:  D-A-J-A-B?

18      MR. WASSERMAN:  Yeah.

19      THE COURT:  First name?

20      MR. WASSERMAN:  Walid, W-A-L-I-D.

21      THE COURT:  Okay.  Got it.

22      MR. WASSERMAN:  I can confirm for the record his last

23  name.

24      THE COURT:  Just so we're clear, Mr. Montenegro was in

25  a meeting where Tim Egan and Mr. Dajab discussed a plan to

1  submit false COVID testing claims?

2  MR. ANDALMAN:  That is what I am actually -- not

3  Mr. Montenegro.  Dr. Applewhite was in such a meeting.  And

4  Dr. Applewhite's counsel informed me of that.

5  The relator was, un- -- that was the relator's

6  understanding, that he was not in the meeting, he had heard

7  about that.

8  THE COURT:  So who told the relator?

9  MR. ANDALMAN:  Well, I don't --

10  THE COURT:  So the only -- only information you have

11  is Applewhite's attorney telling you this.

12  MR. ANDALMAN:  Well, the relator worked there.  It was

13  his understanding working there that that was the arrangement,

14  I don't know the individual who told him that, but that was

15  what he observed in his workplace.

16  It has been confirmed to me now by all the parties.

17  So AML's counsel has agreed that that was the arrangement.

18  Not -- and so has Roseland's and so has Dr. Applewhite's.

19  THE COURT:  Is that a -- is that, Mr. Wasserman --  is

20  your client's position that was in fact engaged in false

21  claims?

22  MR. WASSERMAN:  No, I have never made such a

23  confirmation and I am not doing so now.  In fact, our client

24  maintains that they weren't engaged in any false claims and has

25  told me.

1       THE COURT:  All right.  Let me stop you.  So --

2       MR. WASSERMAN:  Sure.

3       THE COURT:  -- let me ask you, Mr. Andalman, why do

4  you come to that conclusion that AML has basically conceded the

5  false claims point?

6       MR. ANDALMAN:  Well, I wasn't saying that they

7  conceded that it was false.  What I was saying was that they

8  had agreed that Roseland would submit claims and they would

9  then share -- which I believe is also illegal -- share in

10  amounts received on those claims.  So that -- that issue is

11  something that we are -- that we have alleged and that we

12  believe we have now seen substantiation that that's true, but

13  we haven't received very much discovery.

14       Dr. Applewhite's proffer, I guess, through his counsel

15  to me has been that he was in discussions where, for example,

16  he was asked to submit claims on behalf of -- or to approve

17  claims, to sign off and give his subscription as to medical

18  necessity, for full respiratory panels that would be conducted

19  by AML --

20       THE COURT:  And let me ask you --

21       MR. ANDALMAN:  -- on behalf of Roseland.

22       THE COURT:  -- when you say he was asked, who asked

23  him?

24       MR. ANDALMAN:  Dr. Applewhite says he was asked by

25  AML, by Walid and by Egan, to submit claims for full

1    respiratory panels for patients who only came in for a PCR

2    test.  And he says that he actually left the employ of Roseland

3    because he refused to do that because it was self-evidently

4    improper.

5           THE COURT:  Interesting.  And -- because the

6    information I also saw was that Roseland investigated

7    Dr. Applewhite and fired him, right?

8           MR. ANDALMAN:  We believe that's false.

9           THE COURT:  But that's what the information shows.

10   Discovery information at least.

11          MR. ANDALMAN:  That -- no, I don't think that that is

12   what it shows.

13          THE COURT:  I'm not asking you whether you agree or

14   disagree.  But is that what Roseland's position is through its

15   discovery?

16          MR. ANDALMAN:  It is not what its documents show, it

17   is what its lawyers say.

18          THE COURT:  So when you say in your submission,

19   Mr. Andalman, that relator was told that Roseland and AML had

20   an agreement to submit false claims, when you say relator, you

21   mean including relator's agents, such as attorneys?

22          MR. ANDALMAN:  The relator was told that when he

23   worked there.

24          THE COURT:  I know.  So then let me go back to my

25   original question.  Who told the relator?

1      MR. ANDALMAN:  I don't know the answer to that as I

2  sit here today, your Honor.

3      THE COURT:  Well, then how do you not know that, If

4  the relator was told that?

5      MR. ANDALMAN:  Your Honor, that -- it was not a fact

6  that I memorized.  But I'm happy to ask the relator and come

7  back to it.  It is what we have alleged.

8      THE COURT:  So what about this attachment issue,

9  Mr. Wasserman, have you looked into this?

10      MR. WASSERMAN:  I'm sorry, I am not following the

11  question, your Honor.

12      THE COURT:  Part of the motion is that, number one,

13  emails are not produced in native format.

14      MR. WASSERMAN:  Oh.

15      THE COURT:  Number two, while some emails are produced

16  by way of PDF version, attachments referenced therein are not.

17      MR. WASSERMAN:  I -- so there is no question that's

18  true.  The way that the production was done was essentially one

19  700-page PDF printed -- literally printed by my predecessor

20  counsel.  His name, predecessor's counsel's name appears on the

21  documents.  I have never seen somebody do this before.  I -- I

22  can't even begin to defend him.  It is wrong.

23      We have done a proper collection, a native collection

24  of the emails to the tune of tens of thousands of emails.  I do

25  have the attachments in proper native format, Excel, PDF,

1  whatever they are.  They need to be reviewed and produced

2  pursuant to the rules.

3          And I acknowledge to the Court and to the parties that

4  we need to do that and I'm -- we are endeavoring to do that.

5          THE COURT:  Well, do you have a deadline in mind?

6          MR. WASSERMAN:  I guess my response, your Honor, is

7  I'll do what I can to accept whatever the Court directs.  I

8  don't have a deadline in mind.  The reason I say that is

9  because there is a lot of material.  But I'm also mindful of

10  the reality of the timeline of this case, your Honor, and so I

11  want to be respectful of the Court and we'll do what's

12  directed.

13          THE COURT:  Okay.  So let me try to better understand.

14  You say a lot of materials and that somehow is preventing AML

15  from producing the emails or whatever production?

16          MR. WASSERMAN:  No, not at all.  It is just completing

17  our review takes time.  It is not --

18          THE COURT:  Review for responsiveness or privilege?

19          MR. WASSERMAN:  Yeah.  Responsiveness and privilege.

20  But primarily responsiveness.  Privilege should be relatively

21  quick given advances in technology.  It is the responsiveness

22  that I question.

23          And that sort of has impeded some of our ability to

24  produce other records in this case because I want to be able to

25  tell the relator's counsel these are the documents that relate

1    to claims billed by AML versus documents related to claims

2    billed by somebody else.

3          THE COURT:  Let me ask you this question.  Because the

4    motion to compel against AML, I guess they reference Request

5    for Production Numbers 1 through 11, 13 and 14.  So when you

6    say you are reviewing the documents for responsiveness, are you

7    keeping these particular requests in mind or all of the

8    requests served?

9          MR. WASSERMAN:  So of course, your Honor, those

10    particular requests.  But yes, also to your second question in

11    part because, as the Court's already acknowledged, we have to

12    amend discovery responses because they improperly indicated

13    that AML never submitted claims, which relator's counsel is

14    correct, that's actually not true, and at some point AML was

15    submitting its open claims.  I just need to identify what those

16    time periods are and records are.

17          THE COURT:  Okay.  Motion to compel against AML is

18    granted to the extent that AML to provide supplemental

19    discovery responses by October 25.

20          MR. WASSERMAN:  Your Honor, if I may, just for the

21    record, the CEO or president of AML's last name -- it is Walid,

22    W-A-L-I-D, last name is D-A-B as in boy-A an in apple-J as in

23    Jack.

24          THE COURT:  I see.  D-A-B-A-J?

25          MR. WASSERMAN:  Yes, your Honor.

1      THE COURT:  Got it.  Thank you.

2      MR. WASSERMAN:  Sorry about that.

3      THE COURT:  No worries.  Thank you.

4      Then let's go to motion to compel against Roseland.

5  So when a motion to compel is drafted the way the plaintiff has

6  drafted, it is difficult for the Court to enter a specific

7  order that's going to be cabined adequately for the Court to

8  sanction in the event something is not done -- something is not

9  done right.

10      And I say that because plaintiff identifies request

11  for production of document numbers, interrogatory numbers.  But

12  then you address topics that are inadequate.  And what I mean

13  by that is you mentioned things like, oh, we didn't get any

14  supporting documents for the claims submitted.  Well, what are

15  you tying that to?  Which requests?  Which interrogatories?

16      You also mention, hey, we need to get the documents

17  pertaining to the settlement in connection with the BCBS

18  dispute.  Again, what are we taking about here?  Are they

19  specific request numbers that are tied to this particular

20  subject matter?

21      And so what I can do though is provide some guidance

22  on these topics that are raised by the plaintiff.  That's all I

23  can do.

24      And Roseland in kind responded simply to the general

25  topics that are raised in the motion to compel.

1      So, again, let me start with an update from the

2  plaintiff.  Since the filing of the motion, it appears that

3  there was additional activity.  And so I'll ask you, what has

4  happened since the filing of the motion, that's Document Number

5  110, and what issues are still outstanding that the Court needs

6  to address?

7      MR. ANDALMAN:  Your Honor, there has been no

8  additional production since the filing of the motion.  And so

9  we believe all these issues do need to be addressed.  The

10  specific -- and I'm happy to go through it.  We did identify

11  with regard to each general topic the specific RFP numbers that

12  were involved.  I'm happy to review that.  I see that they are

13  referenced in the discussion as opposed to summarized

14  somewhere.  And I apologize for not organizing it that way.

15  But I can go through and point the Court to where in the motion

16  the specific RFPs are identified.

17      THE COURT:  No, we're not going to redraft the motion

18  today in court.

19      MR. ANDALMAN:  I'm not redrafting, I'm just saying

20  I'll read it --

21      THE COURT:  No.  Look, they are grouped together.

22  They are not distinguished.  When I see a motion to compel, I

23  want to know what is the nature of the case, what did you ask

24  for in each specific request or interrogatory, what is the

25  response thereto, and why is it deficient.  That's not done.

1  We're talking about subject matters that plaintiff believes

2  that Roseland failed to address.

3          So let's talk about those subject matters.  Which

4  matter do you want to discuss first?

5          MR. ANDALMAN:  Your Honor, if we could talk about the

6  claims information, because I think that's the critical issue

7  in the case.

8          THE COURT:  Let me ask this question:  According to

9  Roseland, Roseland provided spreadsheets showing each line item

10 that is associated with each claim, right?

11         MR. ANDALMAN:  That is what they say.

12         THE COURT:  But you don't agree with that.

13         MR. ANDALMAN:  I don't.  Well, they did provide

14 spreadsheets, but the spreadsheets do not provide any

15 information that allows us to understand what the government

16 was actually told in the claim, what support there was for the

17 claim, even what services were provided with regard to that

18 claim.  It is just a list of claims.  It does not allow us to

19 evaluate this case.

20         And for them to take the position --

21         THE COURT:  That's not what Roseland said though,

22 right?  That you can actually evaluate the case or the merits

23 of the case by simply looking at the spreadsheet.  That's not

24 what Roseland is saying.

25         MR. ANDALMAN:  I'm happy to share it with your Honor.

1    I have printed some of the copies out and show you.

2              THE COURT:  No, no.

3              MR. ANDALMAN:  You cannot tell from those sheets.

4              THE COURT:  What is my question?  My question is:

5    Roseland did not say the spreadsheet themselves are sufficient

6    to assess the merits of this case.  The spreadsheets are simply

7    a list of claims that Roseland submitted to the government,

8    right?  That's what Roseland is saying.

9              MR. ANDALMAN:  Well, they are saying that is a list of

10   claims, that those claims -- that list does not provide

11   information about the nature of what was claimed.  And what our

12   motion to compel seeks is the documents that support the claims

13   for reimbursement.

14             THE COURT:  Mr. Duff, how many lines are in these

15   spreadsheets reflecting a number of claims submitted?

16             MR. DUFF:  Your Honor, there are two different

17   spreadsheets.  One of them includes -- and there are two

18   spreadsheets because that's what Roseland's -- the hospital's

19   system was able to generate.  But there are tens of thousands

20   of lines on these spreadsheets detailing claims and testing or

21   services rendered.

22             THE COURT:  Let me ask you again.  How many lines do

23   these spreadsheets show and the number of claims?

24             MR. DUFF:  Approximately 23,000.

25             THE COURT:  And 23,000 is combined, both the

1  spreadsheets?

2      MR. DUFF:  I know for sure, your Honor, that one of

3  them is approximately 23,000.  And I -- I'm not remembering

4  exactly the number on the other spreadsheet.

5      THE COURT:  Do they overlap at all in terms of claims

6  submitted?

7      MR. DUFF:  Yes.  So they deal with the same claims

8  submitted.  One of them includes CPT codes, the -- CMS codes

9  that are used to bill these services.

10      I believe the other spreadsheet deals with the actual

11  dollar amounts that are submitted associated with each claim or

12  testing.

13      THE COURT:  So let me come back to you, Mr. Andalman.

14  So you want all documents supporting all 23,000 claims?

15      MR. ANDALMAN:  Yes.  What we asked for --

16      THE COURT:  Because you intend on proving that each of

17  the 23,000 claims is not medically -- was not medically

18  necessary?

19      MR. ANDALMAN:  Yeah.  We intend to provide that --

20      THE COURT:  All 23,000, each claim, per claim.

21      MR. ANDALMAN:  Your Honor, it is -- the penalties are

22  10 to 15 thousand dollars per claim.

23      THE COURT:  No.  Listen to my question.  When you're

24  at trial in front of a jury, you're going to go through each of

25  the 23,000 claims and how each claim is not medically

1   necessary?

2           MR. ANDALMAN:  We will have an expert witness who

3   provides --

4           THE COURT:  Expert witness.

5           MR. ANDALMAN:  And that expert will provide summary

6   documents to the jury and will explain that he has reviewed

7   them --

8           THE COURT:  And let me ask you, how will the expert

9   conduct his study?

10          MR. ANDALMAN:  By reviewing what we request for in RFP

11  4 as outlined on page 8 of our motion.  We ask in that RFP for

12  all documents that constitute Roseland's claims for

13  reimbursement from third-party payors, which is the central

14  issue in every False Claims Act case.

15          THE COURT:  And have you talked to your expert?

16          MR. ANDALMAN:  We have -- I have -- we have not

17  because we have received no information that constitutes the

18  claims.

19          THE COURT:  Do you have a retained expert?

20          MR. ANDALMAN:  We have not even retained the expert,

21  your Honor, because we haven't been able to get any discovery

22  as to what the claims are.

23          THE COURT:  So, I don't understand why you think it is

24  unreasonable for Roseland to say -- why can't we do a

25  statistical sampling of the claims submitted once we have a

1    sample identified by an expert -- because the sample has to be

2    identified by an expert, not by attorneys, and then we have the

3    supporting documents for those claims in that particular sample

4    pool.

5            MR. ANDALMAN:  Your Honor, we don't even --

6            THE COURT:  Why is that unreasonable?

7            MR. ANDALMAN:  Because we don't even have information

8    to give to the expert so that he could make a reasonable

9    educated determination of what a statistically significant

10   sampling would be.  And in this case --

11           THE COURT:  Have you had -- this is -- you don't have

12   an expert, so no one has said -- no one has looked at the

13   spreadsheets and said, oh, Mr. Andalman, this is not

14   sufficient.  I can't look at this as the universe of claims

15   because certain pieces of information is missing.  You don't

16   have that, right?

17           MR. ANDALMAN:  Your Honor, I can do that.  And anyone

18   who looks at the spreadsheet could do that.

19           THE COURT:  No, no, listen to my question.  You don't

20   have that at this time, do you?

21           MR. ANDALMAN:  I don't have -- I have not retained an

22   expert.  But I don't know any rule or authority that requires

23   me to hire an expert before I obtain basic discovery in a case.

24           THE COURT:  Have you done a False Claims Act case --

25           MR. ANDALMAN:  I --

1    THE COURT:  -- where you're dealing with claims

2  submitted to Medicare or Medicaid?

3    MR. ANDALMAN:  I have, your Honor.

4    THE COURT:  And you have used experts in those cases,

5  right?

6    MR. ANDALMAN:  I have.

7    THE COURT:  And you have used statistical sampling

8  rather than going through each claim by claim?

9    MR. ANDALMAN:  I have never had a party or seen a

10  party --

11    THE COURT:  No, no, no.  Listen to my question.

12    MR. ANDALMAN:  Yeah, I haven't had that circumstance

13  come up.

14    THE COURT:  In those situations, you used statistical

15  sampling to actually prove your case?

16    MR. ANDALMAN:  Based on a baseline production from the

17  defendant, which they have not provided.

18    THE COURT:  Okay.  How do you define your baseline

19  production?

20    MR. ANDALMAN:  I would need to know what was billed to

21  the government for each claim.  One of our core allegations,

22  your Honor, is that Roseland chose to bill both serology and

23  PCR tests when that was not medically necessary.  The

24  spreadsheets provide no information as to which claims involve

25  both of those tests.  It is impossible to determine that.

1          So, no, I could not have an expert review it and make

2    a determination as to whether this is a sample of those tests

3    because they have refused to give it.

4          And I gather that, you know, you're saying they don't

5    have to, even though they have documentation that they identify

6    in their interrogatory answers that they say they created for

7    every claim that says what was billed and why.  They have that

8    information.  They have it electronically.  It is in this UB-04

9    claim they have identified in their interrogatories, and they

10   have refused to produce that.

11         THE COURT:  But you are not an expert in this area,

12   right?  Each hospital probably has different ways of keeping

13   records.

14         MR. ANDALMAN:  They have told me how they keep their

15   records, and they have refused to produce the documents.

16         THE COURT:  Why is -- why is it unreasonable for you

17   to have -- because you're going to have an expert in this case.

18   Is that fair to say?

19         MR. ANDALMAN:  Eventually there will be an expert in

20   this case.

21         THE COURT:  Why can't we have the expert take a look

22   at the spreadsheet and say, look, I can certainly do a

23   statistical sampling, but this is what I am missing from these

24   spreadsheets?  Are you in that position to actually say for the

25   expert, oh, I know for a fact that the expert is going to need,

1  you know, these pieces of information and they are missing from
2  the spreadsheets?

3       MR. ANDALMAN:  I -- I know right now the expert would
4  need to know which tests involve -- or which claims involve
5  both the serology and the PCR test.  And they have that
6  information, and they have chosen not to provide it.

7       THE COURT:  And they have that information by UB-40?

8       MR. ANDALMAN:  I think it is UB-04 is what they
9  identified under oath as created for every single claim.

10       UB-04 is the name of the claim.

11       THE COURT:  So let me talk -- turn to you, Mr. Duff.
12  What about that, UB-04?  Mr. Andalman says UB-04 is what he
13  needs.  He doesn't need the spreadsheets.  He doesn't need
14  anything else.  He needs the UB-40 -- UB-04, the start -- the
15  sampling process, which Roseland says that's what we should do.

16       MR. DUFF:  Your Honor, I --

17       THE COURT:  And Mr. Andalman goes beyond that and
18  says, hey, you said you have this information but you're not
19  willing to turn that over.  Why is that?

20       MR. DUFF:  Well, your Honor, it is true that there
21  is -- there are patient records and certainly there are billing
22  records in the hospital system for each of these, let's say,
23  23,000 claims.  Our position is and has been throughout this
24  case, you know, we're happy to engage in a sampling
25  methodology, but the burden on the hospital financially, to go

1  through that level of discovery for each and every single claim

2  is just untenable to the hospital, especially given the

3  hospital's limited resources.  And we have shared this with

4  counsel, that the hospital is frankly in dire straits

5  financially.

6       And so, again, we're happy to engage in whatever

7  sampling methodology we can agree on.  But there is no world in

8  which, you know, we think we need to -- we should have to go

9  through the expense and the effort of going through every

10 single claim.

11      THE COURT:  But Mr. Andalman is not saying that he

12 wants everything at this time, but he's saying, hey, give us

13 the UB-04.

14      MR. DUFF:  Well, I think, your Honor, that the two

15 spreadsheets we have produced -- and this has been our position

16 the whole time as well -- is that you can look at these two

17 spreadsheets and it will require analysis to go through these

18 and to compare the claims on both spreadsheets and line them up

19 correctly and see what amounts of money were billed and using

20 what CPT code.  And you will be able to draw conclusions from

21 that analysis.

22      That's just not an analysis -- we haven't conducted

23 that analysis fully in detail of the spreadsheet data.  And

24 what relator is we understand asking us for --

25      THE COURT:  Right.  No, no, no.  Hold on, Mr. Duff.

1   Mr. Andalman says -- and you can disagree if it is inaccurate.

2   Mr. Andalman says UB-04 forms reflects all the information he

3   needs to engage in a dialogue with Roseland about sampling.

4           Why would it be burdensome to produce the UB-04 forms

5   that are already being maintained by Roseland?

6           MR. DUFF:  Frankly, your Honor, that's still a very

7   large production, and it would require, I think, going into the

8   hospital systems.

9           THE COURT:  Tell me the specifics about the burden.

10          MR. DUFF:  I just know it would be a burden on the

11  hospital to have their --

12          THE COURT:  That's not going to be good enough.  You

13  just know that it is going to be burdensome.  How is that going

14  to be a proper factual foundation for me to say one way or the

15  other whether the discovery is proportional or not?

16          MR. DUFF:  That's fair.  I understand that --

17          THE COURT:  So what are the specific burdens of

18  producing these forms?

19          MR. DUFF:  I -- I am relying on our client's

20  representation to us about what it would take and I --

21          THE COURT:  And you didn't bother to ask more

22  questions, how is it going to be burdensome?  You simply said,

23  oh, yeah, sure it is burdensome?

24          MR. DUFF:  Well, I understand that our hospital has

25  limited IT personnel.  I know it would require a lot of time

1    and effort on their part to pull all of the claims data off of

2    their system.  That's my understanding.  And I don't really

3    have clearer details beyond that.  But I am happy to --

4         THE COURT:  Why don't you?  You know, you understand

5    your obligations in discovery, right?

6         MR. DUFF:  Yes.

7         THE COURT:  I don't think that you have met that

8    obligation if you haven't been asking these questions as to why

9    it would be burdensome to produce UB-04.

10        And, by the way, you haven't disagreed with

11   Mr. Andalman that these forms reflect the information that

12   plaintiff is looking for.

13        MR. DUFF:  Your Honor, frankly, I am not familiar with

14   the form that counsel is referencing.

15        THE COURT:  Why are you here then?  You're

16   representing Roseland.  You are the attorney here in a motion

17   hearing.  And you're telling me you don't know what UB-04

18   shows?

19        MR. DUFF:  Correct, your Honor.  I actually came

20   here -- our -- my understanding was that the parties had been

21   engaging in discussions about a potential settlement conference

22   and there was discussion of continuing these motions.

23        THE COURT:  How is that relevant to this particular

24   motion hearing?

25        MR. DUFF:  That's totally fair, your Honor.  So --

1    THE COURT:  I -- it doesn't make me any -- feel any

2  better that I'm -- my comments are fair, because we're not

3  getting anywhere here.  You know, that's the big problem.

4    So tell me, Mr. Andalman says that the two

5  spreadsheets do not show which claims involve both the COVID

6  testing and blood testing.  Is that accurate?

7    MR. DUFF:  I -- I don't think that's accurate.  And

8  the reason is I think that you can do -- we have an internal

9  expert we're working with, just an attorney at our firm, and we

10 are aware that U -- there is an analysis that can be done to go

11 through these spreadsheets and assess what amounts were billed

12 for each claim and what CPT code was used.

13    THE COURT:  So tell me about this analysis that you

14 think that can be performed.  What analysis are you talking

15 about?

16    MR. DUFF:  Sure.  So, you know, one spreadsheet,

17 again, includes CPT codes.  Each CPT code includes certain

18 criteria that are set by CMS for how it needs to be used.

19    THE COURT:  Well, let me stop you.

20    Mr. Andalman, are you aware that there is a separate

21 CPT code for COVID testing and one for serology?

22    MR. ANDALMAN:  Yes, your Honor.

23    THE COURT:  And these spreadsheets have the CPT codes?

24    MR. ANDALMAN:  For some, not all entries, there are

25 CPT codes.  But they -- it is not clear that it is all the CPT

1    codes that were utilized for particular tests.  So many of them

2    have one item where it appears from the -- and, again, he's

3    saying some internal expert has to compare these two and do an

4    analysis.  I don't -- I'm not an internal expert on their

5    documents.

6         When I look at these, I don't have an ability to make

7    that determination.  And what he is basically saying is they

8    have an internal expert who can compare two lengthy

9    spreadsheets and draw conclusions.  We, as the relator, do not

10   have that capacity.  We actually just need production of the

11   information.

12        MR. DUFF:  Your Honor, if I may, I think any attorney

13   or anyone who is familiar with spreadsheets could conduct this

14   analysis.  We just have someone who has experience in this area

15   who we have had working on this.

16        But this is an analysis that could be conducted by the

17   relator and there is no reason why there is significant

18   expertise that would be needed.

19        THE COURT:  And these spreadsheets are maintained by

20   Roseland or something that was generated by Roseland for this

21   case?

22        MR. DUFF:  These are spreadsheets that have been

23   generated by Roseland as -- as a record of the claims data that

24   it has.

25        And, again, I will also note -- we noted this in our

1   response, your Honor -- that we're happy to provide these two

2   spreadsheets for in camera review if your Honor would prefer.

3   I think that might be productive given that we seem to be

4   disagreeing on the --

5            THE COURT:  No, no.  Listen --

6            MR. DUFF:  -- content of these spreadsheets.

7            THE COURT:  -- please.  My question is:  These two

8   spreadsheets are spreadsheets maintained by Roseland during a

9   normal course of business or generated for this litigation?

10           MR. DUFF:  These are spreadsheets that have been

11  compiled for purposes of this litigation.

12           THE COURT:  Okay.  Let's come back to UB-04.  What is

13  your understanding, Mr. Andalman, to be more precise?

14           MR. ANDALMAN:  My understanding comes from Roseland's

15  response to Interrogatory Number 20 in which they say, Roseland

16  states that generally speaking claims for reimbursement are

17  generated through Roseland's EMR system Meditech and bridged

18  over slash submitted to its billing clearinghouse, which it

19  actually identifies as Change Healthcare.  Change Healthcare in

20  turn creates a claim form called a UB-04.  Roseland's internal

21  billing team reviews claims and releases the claims

22  electronically through Change Healthcare.  Each claim is then

23  sent to the appropriate payor.

24           So that is my understanding that for each claim there

25  should be a UB-04 that describes the claim and its basis.

1    THE COURT:  How do you know that UB-04 form will show

2  that a particular claim is for multiple tests?

3    MR. ANDALMAN:  Because it would -- it would have to

4  explain that based on this explanation that it is in

5  document -- in their interrogatory responses.  It says, it is a

6  claim form.  If it is a claim form that describes the services,

7  it would have to describe that, your Honor.

8    THE COURT:  Let me ask you, Mr. Duff.  You say that

9  these two spreadsheets were compiled for use in this

10  litigation.  What underlying data did Roseland use to compile

11  these two spreadsheets?

12    MR. DUFF:  Your Honor, I am not sure the answer to

13  that.  I am, again, happy to go to our -- the hospital's IT

14  people and to ask exactly, you know, what the source of

15  the -- of the data.  I -- my understanding is it is not data

16  that was -- where they went in and pulled documentation or data

17  from every single claim file.

18    THE COURT:  You know, I appreciate that Roseland wants

19  to meet and confer about discovery issues.  There is no problem

20  with that.  In fact that's something that's encouraged.

21    But it shouldn't take months, right?  And that's the

22  reason why I set these deadlines for filing the motion to

23  compel.  I'm going to require Roseland to produce all relevant

24  UB-04 forms.

25    Okay.  What's the next subject matter, Mr. Andalman?

1          MR. ANDALMAN:  Your Honor, the next most substantive

2     matter involves this -- the Blue Cross Blue Shield claims.  So

3     other understand- -- the relator's understanding, and what he's

4     conveyed to me, and I have confirmed this with Roseland's

5     counsel, the majority of claims that Roseland made were

6     actually made through Blue Cross and Blue Shield.

7          Roseland has refused to provide any information at

8     all, including on these spreadsheets --

9          THE COURT:  Can you go back?  The majority of what

10    claims?

11         MR. ANDALMAN:  Of all COVID testing claims.

12         THE COURT:  Not Medicare or Medicaid?

13         MR. ANDALMAN:  Well, some of those Blue Cross Blue

14    Shield will be Advantage Plus claims related to Medicare and

15    Medicare.  But our claim is not limited to Medicare and

16    Medicaid because we have a claim under the Illinois insurance

17    fraud prevention act which involves false claims to private

18    insurers.

19         THE COURT:  Okay.  Go on.

20         MR. ANDALMAN:  Roseland has refused to provide any

21    data on the spreadsheets or otherwise that has anything to do

22    with any of these Blue Cross Blue Shield claims.  Their only

23    basis for refusing to do so is they claim -- they claimed in

24    their brief they have had a settlement agreement with Blue

25    Cross Blue Shield as to any fraud against --

1      THE COURT:  I understand.  Let me ask you this:  Do

2  you know whether there is UB-04 for these Blue Cross Blue

3  Shield claims?

4      MR. ANDALMAN:  I have to assume that there are because

5  they say they do that for all claims.

6      THE COURT:  And let me ask you, Mr. Duff, the two

7  spreadsheets compiled for this litigation, these two

8  spreadsheets do not include claims submitted to BCBS?

9      MR. DUFF:  That is correct, your Honor.  Because there

10  was this confidential settlement agreement between BCBSIL and

11  the hospital to settle --

12      THE COURT:  But isn't fair to say, Mr. Duff, that the

13  Court did not dismiss plaintiff's IICFPA claim?

14      MR. DUFF:  That's correct.  However, the -- and we

15  discussed this in the briefing.  But the purpose of the IICFPA

16  is not to be a punitive statute, it is to be a remedial

17  statute.  And our position is that --

18      THE COURT:  But let me ask you, Mr. Duff, those are

19  merits issues, not necessarily ripe for discovery.  As long as

20  there is an IICFPA claim pending, why aren't claims submitted

21  to the BCBS relevant and proportional?

22      MR. DUFF:  Well, because I think in the process of

23  discovery, it also involves a weighing of the privacy interests

24  and public policy interests at stake.  And so I think the

25  disclosure of BS -- BCBSIL documents is -- would be very

1  significant because it would contravene the settlement

2  agreement between the hospital and BCBSIL.  And so that's why

3  this is, we believe, the correct point in time to address this

4  issue is because what -- you know, once these documents are

5  disclosed, there -- you know, there is no clawing them back.

6  But, you know, again --

7       THE COURT:  But isn't that an affirmative defense that

8  Roseland has to prove at trial?  That because there is this

9  settlement agreement, that even though there may be false

10  claims, it is a moot point?  In other words, plaintiff simply

11  cannot recover any relief as a result of the agreement, but

12  it's not something that the Court or the jury has to deal with

13  at a later time.

14       MR. DUFF:  I think the merits of the claim are

15  distinct from whether there needs to be disclosure of what we

16  have asserted is confidential information.  And so I think this

17  juncture in discovery, the Court, your Honor, has a duty to

18  weigh the privacy interests and the proportionality of the

19  case.

20       THE COURT:  When you say privacy interest, whose

21  privacy interest?

22       MR. DUFF:  I think both of the parties to the

23  confidential settlement agreement, BCBSIL and Roseland.

24       I would also note, in addition to that, that there is

25  a wealth of patient health data that is associated with all the

1   BCBSIL claims, which is an added consideration.

2          THE COURT:  But it doesn't appear to me from the

3   submissions that this particular repayment agreement actually

4   resolved the claims or issues between BCBS and Roseland.  It

5   appears after the agreement was fully executed, another issue

6   came up where the special investigation division had to get

7   involved, right?

8          MR. DUFF:  That's right.  But the -- the repayment

9   agreement was an agreement between the two parties about how

10  they would proceed to resolve any disputes.  And so that --

11  that agreement itself in that sense was a resolution.  And the

12  patients's negotiations, both before and after their payment

13  agreement, were confidential and are confidential.

14         We have also provided the affidavit of Roseland's

15  chief financial officer Robert Vais attesting to the fact that

16  the hospital understood these negotiations to be in confidence.

17         And so for that reason, you know -- it is true that

18  there were discussions both before and after the agreement, but

19  I don't think that takes away from the fact that the entire

20  thing is --

21         THE COURT:  So tell me --

22         MR. DUFF:  -- confidential.

23         THE COURT:  Walk me through how this is going to play

24  out.  You say we're not producing any documents regarding the

25  repayment agreement.  Oh, and by the way, jury or judge, the

1   IICFPA claim should be dismissed or adjudicated in favor of

2   Roseland because we have this repayment agreement.  How does

3   that work?

4           MR. DUFF:  I think -- if there were any other claims

5   submitted to the other third-party payors, which I believe are

6   included in the claims data on the spreadsheets we have

7   produced -- I'm not sure if relator is aware of any other

8   third-party payors claims that are at issue -- those would, I

9   think, be an appropriate subject for the IICFPA claim.

10          THE COURT:  And yet Roseland hasn't filed a motion to

11  carve this particular portion out of the case.  In other words,

12  the claims are what they are and the claims involve BCBS

13  claims, right?

14          MR. DUFF:  Well, that's right.  I -- based on the

15  complaint, the relator's complaint, I don't think it is

16  exclusively based on BCBSIL claims.  We did file a motion to

17  dismiss, which was denied.  But I think this is the juncture in

18  the case where this issue has come up in discovery.

19          THE COURT:  Do you agree, Mr. Duff, that

20  Mr. Andalman's comment that BCBS claims are the majority of the

21  claims that Roseland submitted?

22          MR. DUFF:  I don't -- I don't think I would agree

23  sitting here today that it is a majority of the claims Roseland

24  submitted.  That may be true after an extensive review --

25          THE COURT:  Okay.

1     MR. DUFF:  -- of the data.

2     THE COURT:  Large share of the claims submitted.

3     MR. DUFF:  Again, your Honor, I don't have a sense --

4     THE COURT:  How long have you been on this case?

5     MR. DUFF:  Since after the discovery began, your

6 Honor.

7     THE COURT:  And so what if they are confidential,

8 don't we have a confidentiality order here in this case?

9     Mr. Andalman?

10     MR. ANDALMAN:  We do, your Honor.

11     THE COURT:  So what if they are confidential?

12 Confidential information is exchanged all the time in

13 discovery, as long as there is an agreement and documents are

14 properly designated as confidential.  Why shouldn't the

15 plaintiff be entitled to look at these documents, especially

16 because of your affirmative defense?

17     MR. DUFF:  Yeah, I think it is true, of course, that

18 we have a confidentiality order in place.  I don't think that

19 fact on its own means that when -- what we see as a very clear

20 issue, that there is a resolution agreement in place, it is

21 confidential.  Just because there is a confidentiality order in

22 place in this case doesn't necessarily mean -- I think that

23 those are documents that are going to be able to ultimately be

24 shown to a jury or be used in the IICFPA claim.

25     I'll also note, I think, there is essentially one case

1    that the relator has relied on, and it did not involve a

2    situation where there was a settlement agreement and

3    confidential resolution --

4         THE COURT:  So the problem I am having with this is

5    that you're asking the Court and the plaintiff to essentially

6    trust and adopt Roseland's position wholesale without any kind

7    of scrutiny, without examining the agreement and how it may fit

8    into this particular case.  Because under the Act, State of

9    Illinois is the real party in interest.  State of Illinois has

10   an interest in ensuring that fraudulent claims are not

11   submitted.  Not simply to protect BCBS's coffer, but also to

12   protect all citizens of Illinois.  Because we all understand

13   how insurance industry works, higher the claims, claims paid

14   out, it actually impacts the premium that all subscribers have

15   to pay.

16        So what if BCBS made a settlement with Roseland, what

17   about the rest of the State of Illinois that has an interest in

18   ensuring that fraudulent claims are not submitted?  So why

19   shouldn't plaintiff be able to prosecute?  Again, we come back

20   to the motion to dismiss.  It has been denied.  The claim

21   stands, right?

22        MR. DUFF:  Yeah.  I think in the -- sort of given the

23   situation in this case where, again, this agreement is in

24   place, and considering that the statute, the purpose of the

25   statute is not to be punitive, it is to be remedial.  So our

1  position has been, you know, the entire time that any issues

2  that existed between the hospital and BCBSIL have been

3  resolved, they have been remediated.  And so there is no -- the

4  purpose of the statute is to remedy, you know, insurance claims

5  issues --

6          THE COURT:  Are you saying Roseland is not going to

7  make any argument whatsoever that this case cannot be

8  maintained, at least the state claim cannot be maintained

9  against Roseland because of the settlement?  You're not going

10  to make that argument?

11          Of course you're making the argument, right?

12          MR. DUFF:  Well, there are -- yes, as to the BCBSIL

13  claims.

14          THE COURT:  So I don't understand it.  This is -- I

15  started this inquiry by asking a question:  How is it

16  possible -- help me out -- help me understand how is it

17  possible for Roseland to offer the agreement as defense, but

18  plaintiff is not entitled to any documents regarding that

19  agreement?  Can I ever see a situation where that's allowed in

20  civil litigation?

21          MR. DUFF:  Your Honor, I believe that, you know, in

22  civil litigation, if you had a confidential settlement

23  agreement between two -- you know, a party to the case and a

24  third party, I'm not sure that complying production of

25  documents related to the --

1          THE COURT:  I think you're missing my point.

2          Comment from Mr. Andalman, if any.

3          MR. ANDALMAN:  I don't have anything to add, your

4     Honor.  I think you understand our arguments.

5          THE COURT:  But I have a question for the plaintiff.

6          MR. ANDALMAN:  Sure.

7          THE COURT:  502(b) doesn't apply here because we're

8     not dealing with privileged information.  We're dealing with

9     confidential information, yes, but not privileged information.

10          But Rule 408 is quite clear, we're not going to admit

11     and rely on information that pertains to settlement

12     negotiations.  Why is this important to your case?

13          MR. ANDALMAN:  Well, first of all this --

14          THE COURT:  Who cares -- who cares that they had an

15     agreement?  Because your position is we don't care that BCBS

16     settled with Roseland, we still have standing to sue on behalf

17     of the State of Illinois to ensure that fraudulent claims are

18     not permitted, right?

19          MR. ANDALMAN:  Absolutely.

20          THE COURT:  So why do we care about this agreement?

21          MR. ANDALMAN:  Well, your Honor, I -- for us the issue

22     isn't the agreement because the agreement was produced by AML

23     without a confidentiality note, by the way, and AML was not a

24     party to it, but it gave us a copy.  It is not a settlement

25     agreement so I don't think 408 has any applicability, doesn't

1  release any claims, nor does it suggest that any claims are

2  resolved.

3          And what we're looking for is documentation.  For

4  example, as the Court pointed out, the UB-04 forms for the Blue

5  Cross Blue Shield claims that's relevant to us.

6          The other thing that would be relevant to us is there

7  was plainly a view by Blue Cross Blue Shield that there were

8  fraudulent claims being made.  Because on May 4th, when the

9  payment -- a prepayment was due under this repayment agreement,

10 it wasn't made.  And that's the emails that we attached.  And

11 they said -- Roseland said, why wasn't it made?  And Blue Cross

12 responded, because our special investigations unit thinks that

13 maybe these claims are fraudulent.

14         Well, what happened after that with regard to internal

15 communications within Roseland or with Blue Cross Blue Shield

16 demonstrating that the claims were false are relevant to our

17 claim on behalf of the State of Illinois, which is separate,

18 that indeed they were engaged in insurance fraud.

19         And I would just add, as the Illinois Supreme Court

20 pointed out in the Liebowitz case, that the Illinois insurance

21 fraud act that we're talking about is a separate provision for

22 causes of action by insurers.

23         That's not what we're suing under.  What we're suing

24 under is the damage to the state when individuals or entities

25 like Roseland make fraudulent claims.  We're entitled to

1  discovery about those claims as to Blue Cross Blue Shield just

2  as we are as to other third-party payors.

3      THE COURT:  With regarding the subject matter of UB-04

4  for Blue Cross Blue Shield claims, plaintiff has the better

5  argument here.  I don't see how the repayment agreement has

6  anything to do with the IICFPA claim, that it is in fact

7  pending against Roseland.  The only thing that the Court cares

8  about is whether the claims are relevant and proportional to

9  the needs of this case.

10     Without knowing the claims, without knowing the

11  universe of claims, plaintiff is not able to prosecute

12  reasonably.  And if in fact repayment agreement is somehow a

13  form of defense, it gives more reason why information

14  surrounding the repayment agreement is important.  Which

15  includes the actual claims submitted to BCBS.

16     So for those reasons, Roseland is required to produce

17  all UB-04 for the relevant time period.  Which is what?  What

18  is the relevant time period?

19     MR. ANDALMAN:  Relevant time period, your Honor, is

20  March of 2020 through to the present.

21     THE COURT:  Wait a second.  We're not -- wait.  You

22  want all claims that Roseland submitted to BCBS?  That can't be

23  right.

24     MR. ANDALMAN:  Only -- not all claims.  Only with

25  regard to this COVID testing.  Because we don't have

 1   information that these policies ever stopped at Roseland.

 2          THE COURT:  Thank you.

 3          MR. DUFF:  I was going to clarify that.  I just want

 4   to make sure that we are on the same page about which -- what

 5   kind of testing this is encompassing.

 6          MR. ANDALMAN:  Yeah, yeah.

 7          THE COURT:  All right.  For that relevant time period

 8   for the relevant, I guess, CPT codes.

 9          Okay.  What's the next subject matter?

10          MR. ANDALMAN:  And, your Honor, just to be clear about

11   the testing, we're really talking about the COVID testing that

12   would have included PCR, serology, and the full respiratory

13   panels.

14          THE COURT:  Thank you for the clarification.

15          MR. ANDALMAN:  Your Honor, the next category involves

16   emails and ESI from 2020.  So we reviewed what Roseland said in

17   their response.  Some of which is true and some of which turned

18   out not to be true.  It -- they produced ESI that somehow had

19   its metadata changed.

20          THE COURT:  Say that one more time.

21          MR. ANDALMAN:  The ESI, electronic discovery, that had

22   had its metadata altered in some way.  So that when we searched

23   for the year 2020, we didn't see it.  They said well, yes,

24   that's because the date field in the metadata was somehow

25   changed to 2021.  It never explained how that happened.  But

1   that in fact we did produce some documents from 2020.

2        So we went into the lists in their motion to see if we

3   could confirm that, and it is true that there are some 2020

4   emails that were produced.  It is not a full (unintelligible)

5   responsive set.

6        So, for example, even in the very limited production

7   that AML provided, we have found multiple examples of

8   responsive 2020 emails that AML provided that involved Roseland

9   that Roseland did not produce.

10        We also found documents, multiple ones, that they say

11   in their brief came from 2020.  When we opened on the included

12   correspondence, sometimes from 2021, sometimes from 2023.

13        So the list that they provided in their brief were

14   not, unfortunately, reliable.  And the issue we have is that it

15   seems clear to us that they have not provided an actual

16   comprehensive production responsive to our request from the

17   year 2020, which is the key year because that's when the

18   policies were formulated for these billing practices.

19        THE COURT:  So if I am understanding your in-court

20   argument today, it appears to be a little bit different than

21   the motion itself.

22        MR. ANDALMAN:  Okay.

23        THE COURT:  The motion simply says everything -- hey,

24   Roseland, you didn't produce any 2020 documents.  Roseland

25   says, no, you got it wrong, we did produce 2020 documents.

1       What you're now saying is based on Roseland's response

2    to the motion, you went back to take a look and it appears

3    that, yes, there are 2020 -- year 2020-generated documents, but

4    it appears that the production is insufficient because, as an

5    example, certain emails produced by AML were not in fact

6    collected and produced by Roseland, which should have been in

7    their collection.

8        MR. ANDALMAN:  That's correct, your Honor.  We were

9    unaware that there had been changes in the metadata of what

10    they produced.  So under Rule 34, parties are to produce

11    information, electronic information in the manner in which it

12    is kept.  Somehow that did not happen with Roseland's

13    production.  So when we searched the metadata for date created

14    or edited, what we found was nothing from 2020.

15        THE COURT:  Who is your ESI coordinator?  Or do you

16    have someone who is assigned to address ESI issues for this

17    particular case?

18        MR. ANDALMAN:  Our lawyers work on it, including

19    Ms. Guler here.

20        THE COURT:  Mr. Duff, do you have a response that --

21    response to the assertion that 550 pages of documents from 2020

22    produced are not adequate?  Because clearly certain emails AML

23    produced should have been part of that production but those

24    emails are missing.  Now that causes suspicion over Roseland's

25    efforts to in fact collect all responsive emails.

1    Response?

2        MR. DUFF:  Well, we were happy to clarify the metadata

3    issue.  And so when initially relator let us know that, you

4    know, they weren't seeing any 2020 documents, we were happy to

5    clarify that, that issue that some of the dates were wrong.

6        I think, you know, we have conducted our review of the

7    production we have got from our client.  We have attempted to

8    do -- you know, make a good effort to do so.  And the Bates

9    ranges that we have identified, which is hundreds of pages of

10   documents from 2020, we believe were accurate.

11       If relator is communicating to us today that there are

12   some documents they think were not produced, we are happy to go

13   back and take a second look and to make sure that if there were

14   anything -- any communications that (unintelligible) we're

15   happy to go and try and find those.

16       But based on our efforts in this case, we are -- we

17   went into today confident that we had produced everything that

18   was responsive from 2020.

19       MR. ANDALMAN:  Your Honor, if I could suggest, with

20   regard to this issue, so this issue -- the explanation that the

21   metadata was changed, we don't -- we still don't have an

22   explanation why, but that it was -- did not come in between our

23   letter on August 7th and the deadline for us to file this

24   motion at the end of August.  It didn't come until a couple

25   weeks later when they filed their response.

1      But we're happy to meet and confer on this specific

2  issue so that we can provide it to you, if necessary, in a more

3  focused form.

4      I would only add to that, that with regard to the Blue

5  Cross Blue Shield issue, I am presuming, Mr. Duff can confirm,

6  that no email or other documentation was produced that would

7  otherwise have been responsive if it involved Blue Cross and

8  Blue Shield.  And we do believe the Court's order should

9  include that production today.

10      THE COURT:  With respect to BCBS, it is not to be

11  carved out in this discovery.  The claim under the Illinois law

12  remains.  And plaintiff is entitled to know what claims were

13  submitted to BCBS.

14      So if in fact Roseland in any way basically said, we

15  are going to go ahead and respond to the discovery request, but

16  anything dealing with BCBS is off limits, that is an incorrect

17  position to take.

18      And my order is that if in fact that position was

19  taken, it needs to be reversed and Roseland needs to revisit

20  the discovery requests and provide responsive documents

21  pertaining to BCBS claims.

22      MR. DUFF:  And, your Honor, just to clarify, that is

23  as to all confidential discussions between BCBS and the

24  hospital?

25      THE COURT:  That's right.

1          MR. DUFF:  Okay.

2          THE COURT:  I mean, you have the control over how you

3    designate the information.  And plaintiff will have to abide by

4    the designation, unless plaintiff challenges the designation.

5    And in which case, I will in fact rule on the designation

6    whether it is in fact proper.

7          Regarding the -- yeah, I looked at that as well, why

8    something is not marked as 2020 and it appears to be generated

9    in 2021.  So what we need to do is this:  One, not only do we

10   have a suspicion over whether any alterations are made.  Number

11   two, we also have a question as to whether the search protocol

12   was robust enough to in fact collect and -- collect all

13   responsive documents.

14         So I'm going to require the parties to have at least

15   an initial discussion to set the table by no later than October

16   25.

17         So this is -- this conference is limited to having the

18   discussion about Roseland's ESI search protocol.

19         I'm not a fan of discovery on discovery, but I believe

20   that we have sufficient information to require this type of

21   conference at this time.

22         Okay.  Next subject matter.

23         MR. ANDALMAN:  Your Honor, the next subject matter

24   involves that interrogatory responses.  Some of these, I think,

25   can be resolved through the Court's prior rulings.  For

1    example, we raise the issue about identification of number of

2    claims involving PCR and serology tests, which was

3    Interrogatory Number 4.  But it seems to us we'll get that

4    information with the UB-04 forms.

5         With regard to Interrogatory Number 12, Roseland would

6    not answer that based on the Blue Cross Blue Shield argument

7    that the Court has addressed.  So presumably they will now

8    provide an answer to that interrogatory.

9         And then the other interrogatories we had raised were

10   22 to 26, which were asking Roseland to identify the facts it

11   relied upon in pleading its affirmative defenses.  And that's

12   where Roseland in essence just said, read our motion to

13   dismiss.  And we don't think that is an adequate response.

14        THE COURT:  So regarding the affirmative defenses --

15   and this so troubles me.  I think that attorneys really --

16   don't really research the issue properly before they're

17   actually asserting these affirmative defenses.  Somehow yes,

18   they all look great, that you have a list of affirmative

19   defenses, but they are meaningless.

20        For instance, first affirmative defense, lack of

21   falsity.  That's not an affirmative defense.  That's actually a

22   merit defense that you do not submit false claims.  Defendant

23   does not have the standard of proof.  Plaintiff bears that

24   burden to show that claims are in fact false.

25        An affirmative defense, if you look at it this way,

1  assume for the sake of argument that your allegations are true

2  and there is liability, affirmative defense then comes in and

3  says, but, irrespective of that, we're not liable for any

4  judgment because of X, Y, and Z.  When you look at it that way,

5  you can see why the first affirmative defense doesn't make any

6  sense.  Same thing with second affirmative defense.

7       And so I think that Roseland needs to look at these

8  affirmative defenses and figure out whether you have reasonable

9  factual basis for asserting them.  If you don't, you need to

10  withdraw them or answer the question, what are your underlying

11  facts supporting these defenses.

12       You can't say discovery is ongoing.  We don't have any

13  facts.  Well, Rule 11 pretty much says exactly what your

14  obligations are when you are signing pleadings.

15       So either you answer the questions or you withdraw the

16  defenses so you don't have to deal with discovery.

17       Now when you do withdraw, it doesn't mean that you

18  can't assert affirmative defenses at a later time.  When facts

19  do surface and you have those facts and then within a

20  reasonable period of time you go into court and say, hey,

21  Judge, we need to go ahead and amend our answer because we now

22  have facts showing that we are entitled to certain affirmative

23  defenses.  But to say a knee-jerk reaction, oh, we need to go

24  ahead and list these affirmative defenses in an answer, no,

25  that is not right.

1          To the extent that you have, then it is fair game.

2   Plaintiff is entitled to know what facts you relied on in

3   asserting these defenses.  That's my ruling as to those.

4          What's the next subject matter?

5          MR. ANDALMAN:  Your Honor, the next, and I think the

6   last subject, is pretty narrow.  It -- we had made an -- raised

7   an issue about the boilerplate and general objections.

8          But the real issue there is under Rule 34(b)(2)(C)

9   parties are required to say whether documents are being

10  withheld based on objections.  Roseland hasn't done that.  And

11  we would ask that they let us know so that if there are issues,

12  we can talk those through.  But we don't know whether they are

13  withholding documents based on their objections.

14         THE COURT:  I have to assume that attorneys have read

15  Rule 34.  And if they don't say that we are withholding certain

16  documents based on certain objection, then they are not

17  withholding any documents.

18         Now, how is that significant?  Let's say during a

19  deposition somebody blurts out that they have this information

20  or I communicated using slack or whatever the case may be.  And

21  yet, there is the response, doesn't say anything about

22  withholding.  Well, then we have a problem.

23         And so I believe in the honor system.  In discovery we

24  essentially work on an honor system.  We have to trust each

25  other.  So if you don't follow the rule, the only outcome there

1    is that you are going to be sanctioned at a later time.

2           So all I can say is that the parties are to follow the

3    rules.  And if they don't, then obviously appropriate motion

4    will be filed and we'll deal with it at that time.

5           MR. ANDALMAN:  Okay.  Thank you, your Honor.

6           We don't have anything further then.

7           THE COURT:  I'm going to go ahead and simply say in my

8    order today, for the reasons stated in open court, motion to

9    compel is denied in part, granted in part.

10          Whenever I say -- whatever I said here controls,

11   rather than any minute order that I enter.

12          I am -- yes, I'm sure you have actually perceived that

13   I am a little bit frustrated with the pace of discovery.  But

14   I'm also frustrated with the way issues are presented to me.

15   You have to understand, my orders -- in order my -- in order

16   for my rulings to be specific, your motion has to be specific.

17          And what happens then is if the ruling is simply based

18   on these subjects matters, what's going to happen?  You're

19   going to end up having to file another motion to compel because

20   perhaps the defendants didn't proceed the way plaintiff

21   proceeded.  And so that's why I dealt with the issues today the

22   way I did in terms of providing guidance on the subject

23   matters.  And where appropriate, I ruled that Roseland needs to

24   produce certain information.  Okay?

25          MR. ANDALMAN:  Thank you for your time, your Honor.

1          THE COURT:  With respect to the deadline by when

2     Roseland must comply with these rulings --

3          MR. DUFF:  Your Honor, if I may, I would just say, you

4     know, one thing that we -- has been a consideration throughout

5     this case from the hospital is its depleting financial

6     resources.  And so one thing that would -- you know, for

7     example, the hospital's insurance is covering part of its

8     defense and liability in this case.  But it is a depleting

9     limits policy.

10          If there is any -- there has been some discussion of

11     potential settlement in this case.  And so the one thing I

12     would say is it will be -- we will be much more enabled to

13     pursue a settlement, a resolution of this case before an

14     immense discovery effort following these motions to compel.

15          So for that reason, we would ask for an extended

16     deadline, if at all possible, if there is a chance.  And I'm

17     happy to have counsel jump in if there is a chance to pursue

18     resolution in the meantime.

19          THE COURT:  The deadline for complying is November

20     8th.  I appreciate what you are saying, Mr. Duff, and I want to

21     do everything I can to encourage the parties to resolve this

22     matter obviously, because that would be the better outcome

23     rather than the Court deciding.

24          That said, this case has been pending for a very long

25     time.  And everyone knows what it takes to litigate a civil

1  case of this nature.  And yet I haven't heard anything from the

2  parties that there has been some active negotiation to resolve

3  this matter.

4       And so I'm not going to rely on this representation

5  that Roseland wishes to settle this case to delay discovery in

6  this case,

7       Now that said, if the parties want to provide specific

8  information saying, oh, Judge, we have been discussing

9  actively, it sounds like it is very productive and we can

10  really maybe get to the touchdown end zone, then I certainly

11  will consider extending the deadline.  But without something

12  more specific and concrete, I'm not willing to delay discovery

13  any further.

14       And on a theoretical level, it makes sense, right,

15  that Roseland will say it has very limited resources.  But,

16  again, that's meaningless to me.  What does that really mean,

17  you know?  I have no idea what you mean by that.  That it's

18  running out of money.  I don't know what that means, you know,

19  in terms of complying with the Court's order.  What is

20  required?

21       And I'll give you an example.  I had this issue come

22  up in terms of burden of production.  One attorney came in

23  actually had a declaration.  I took one example.  What was

24  required?  Went through each step that individual had to

25  complete to show burden.  That specificity is what the Court

1    requires.

2           To say that something is overly burdensome --

3    certainly proportionality does require the Court to consider

4    the many factors, including the ability on the part of the

5    defendant to be able to produce the discovery that is needed.

6    So -- but without specifics, there isn't a whole lot I can do.

7           Anything else?

8           MR. ANDALMAN:  No.  Thank you, your Honor.

9           THE COURT:  Mr. Wasserman?

10          MR. WASSERMAN:  No, your Honor.  Thank you for your

11   time.

12          THE COURT:  Mr. Duff?

13          MR. DUFF:  No, your Honor.

14          THE COURT:  Thank you.

15      (Which concluded the proceedings.)

16                        CERTIFICATE

17          I certify that the foregoing is a correct transcript

18   from the digital recording of proceedings in the above-entitled

19   matter to the best of my ability, given the limitation of using

20   a digital-recording system.

21

22

23   */s/Pamela S. Warren*              November 7, 2024
     Official Court Reporter - Retired           Date
24   United States District Court
     Northern District of Illinois
25   Eastern Division